**Gerard Colby ZILG,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**PRENTICE–HALL, INC.,**
**Defendant-Appellant,**

**and**

**E.I. DuPont de Nemours & Co., Inc.,**
**Defendant-Cross-Appellee.**

**No. 620, Dockets 82–7335, 82–7425.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 1982.

Decided Sept. 1, 1983.

---

John Koshel, New York City (Mark J. Lawless, Patricia Kotyk-Zalisko, New York City, of counsel), for defendant-appellant.

Ronald E. DePetris, New York City (DePetris & Stewart, New York City, of counsel), for plaintiff-appellee-cross-appellant.

John R. Schoemer, Jr., New York City (Townley & Updike, Robin Bierstedt, New York City, Edward W. Schall, Wilmington, Delaware, of counsel), for defendant-cross-appellee.

Irwin Karp, Port Chester, N.Y., for amicus curiae The Authors League of America, Inc.

Before WATERMAN, PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Prentice-Hall, Inc. ("P–H") appeals from a judgment entered after a bench trial before Judge Brieant ordering it to pay damages of $24,250 plus pre-judgment interest to the plaintiff, Gerard Colby Zilg, for breach of contract. Zilg cross-appeals the judgment in favor of E.I. DuPont de Nemours & Co., Inc. ("DuPont Company") on his claim of tortious interference with contract. We reverse as to Zilg's breach of contract claim against P–H and affirm the judgment in favor of the DuPont Company.

## BACKGROUND

Gerard Colby Zilg is the author of *DuPont: Behind the Nylon Curtain,* an historical account of the role of the DuPont family in American social, political and economic affairs. Early in 1972, after one partially successful and several unsuccessful efforts to find a publisher for his proposed book, Zilg's agent introduced him to Bram Cavin, a senior editor in P–H's Trade Book Division. Cavin expressed interest in the book, and he and Zilg submitted a formal proposal to John Kirk, P–H's Editor-in-Chief at that time. Kirk approved the proposal, which described the future book as

a thoroughly documented study of the major role the DuPont family has played in the development of modern America and its corporate and social institutions. After skimming lightly over the family's origins in France and its development of its gunpowder business up to and through the Civil War, the book will concentrate on the period after that conflict right down to the present day. The story—essentially one of money and power—is going to be told in human terms and in the lives of the members of the family and their actions. The family will be looked upon as a unit in its relations to the outside world. But it will also be shown to be, as many families frequently are, one torn by feuds and struggles over the money and the power.

As it passed through the editorial and corporate hierarchy, the proposal received a notation from P–H's publicity director that the book's potential for radio and television coverage was "slight to non-existent unless matter in [the] book is highly controversial and print [media] says so first."

P–H and Zilg executed a form contract which provided in relevant part:

3. The manuscript ... will be delivered ... by the AUTHOR to the PUBLISH-

ER in final form and content acceptable to the PUBLISHER....

4. When the manuscript has been accepted and approved for publication by the PUBLISHER ... it will be published at the PUBLISHER'S own expense....

12. The PUBLISHER shall have the right: (1) to publish the work in such style as it deems best suited to the sale of the work; (2) to fix or alter the prices at which the work shall be sold; (3) to determine the method and means of advertising, publicizing, and selling the work, the number and destination of free copies, and all other publishing details, including the number of copies to be printed, if from plates or type or by other process, date of publishing, form, style, size, type, paper to be used, and like details.

Zilg submitted the first half of his completed manuscript to Cavin in November, 1972, and the remainder a year later. Cavin authorized acceptance of the work on behalf of P–H, apparently without the participation of Peter Grenquist, who had become president of P–H's Trade Book Division sometime after execution of the contract but before submission of the manuscript. P–H's legal division scrutinized the manuscript for libelous content and concluded that, if a libel action were brought, P–H "would ultimately prevail" because the subject matter of the work was constitutionally privileged and the plaintiffs would have to prove actual malice. The division's opinion noted, however, that litigation against the DuPonts would be very costly.

A decision was made to accept the manuscript which was distributed to selected wholesalers, reviewers, and booksellers. Copies were also sent to the editorial director of the Book of the Month Club ("BOMC"). Although BOMC decided not to offer the book as a selection of its main club, a subsidiary, the Fortune Book Club, which appealed to a readership composed largely of business executives, did choose it as a selection.

A committee of various P–H department representatives, including the book's editor, met on March 28, 1974 to discuss production plans. The sales estimates of committee members varied from 12 to 15 thousand copies for the first year although by May two members were predicting sales of only 10 thousand. Estimates of from 15 to 20 thousand sales over a five year period were also made. Cavin, an ardent supporter of the book, made estimates of 20 to 25 thousand in the first year and 25 to 35 thousand over five years. The committee decided on a first printing of 15,000 copies at a retail price of $12.95 per copy. At a later meeting, the committee decided to devote roughly $15,000 to advertising.

Although the literary or scholarly merits of the book are not our concern, its nature, tone and marketability among various audiences are key facts in this litigation, for they bear upon the book's prospects for commercial success and illuminate the negative reactions which later set in at P–H. The book is a harshly critical portrait of the DuPont family and their role in American social, political and economic history. Indeed, it is a harshly critical portrait of that history itself. The reactions of readers and reviewers in the record indicate that the book is polarizing, the difference in viewpoint depending in no small measure upon the politics of the beholder. A significant number of readers regard the book as a strident caricature, drawing every conceivable inference against the DuPont family and firms with which members of the family were or are associated. One judge at BOMC, for example, described it as "300,000 words of pure spite." On the other hand, the book has a loyal band of admirers. It received a favorable review in many newspapers, including the New York Times Book Review section. Its comprehensiveness and the extensive research on which it was based were frequently noted. The book also has some appeal to another audience, namely readers with a taste for gossip about the rich and powerful, particularly readers in Delaware. Indeed, it was once first in non-fiction sales in that state.

In the American market, the book's appeal is somewhat limited by the fact that it

is not a work critical of business on grounds that reform of capitalism is necessary in order to save it, a viewpoint with mainstream appeal. Rather, it presents a Marxist view of history. Also weighing against its overall marketability were its size (586 pages of text, 2 inches thick, three and one-half pounds), complexity (almost 200 family members with the surname DuPont and 170 years of American history) and price ($12.95 in 1974 dollars).

Prior to June, 1974, Grenquist appears not to have been aware of the nature and tone of the book, of the intensity of negative feeling it might arouse in some readers or of evidence of serious inaccuracies. He may have been reassured partly by Cavin's enthusiasm and partly by the book's selection by the Fortune Book Club. That selection itself remains something of a mystery since the Club's inside reader concluded it was "a bad book, politically crude and cheaply journalistic." However, instead of accepting his recommendation that it "be fed back to the author page by page," BOMC contracted with P–H to have it adopted by the Fortune Book Club.

In June, 1974, a chain of events was set in motion which apprised Grenquist of the negative aspects of Zilg's work. A member of the DuPont family obtained an advance copy of the manuscript from a bookseller and, predictably outraged, turned it over to the Public Affairs Department of the DuPont Company. Members of that department sought to locate individuals in P–H's management whom they knew personally in order to speak privately about the book, but to no avail. They advised the family member to do nothing before the book was published.

In July, the DuPont Company learned that the book had been accepted as a Fortune Book Club selection and decided to act before publication anyway. Harold Brown of DuPont ("DuPont-Brown") telephoned Vilma Bergane, a manager of Fortune Book Club, having received her name from the managing editor of *Fortune Magazine*. He told her that the book had been read by several persons, some of whom were attorneys, and that the book was "scurrilous" and "actionable." Bergane passed on a version of DuPont-Brown's remarks to F. Harry Brown, Editor-in-Chief of BOMC ("BOMC-Brown"). DuPont-Brown then told BOMC-Brown that DuPont family attorneys found the book abusive and that he was to try to locate someone at P–H with whom to discuss the book. He also told BOMC-Brown that the DuPont Company did not intend to throw its weight around. BOMC-Brown referred DuPont-Brown to Peter Grenquist at P–H.

Some days later, apparently in an effort to quash rumors or inaccurate messages to the contrary, DuPont-Brown phoned Grenquist to assure him that DuPont was not attempting to block publication of the book, initiate litigation, or even approach P–H in any kind of adversarial posture. One such rumor, allegedly passed on to Cavin by an editor at BOMC who does not remember the conversation, was that DuPont had gone to *Fortune Magazine* and threatened to pull all its advertising. *Fortune*, owned by Time, Inc., had no connection with the Fortune Book Club at this time.

Meanwhile, BOMC-Brown decided to look into the matter personally. Over the July 27–28 weekend, he "spent a horrible two days reading" the book and decided it was an unsuitable selection for the Fortune Book Club. He later stated he felt no pressure from the DuPont Company in reaching this decision. In view of the nature of the book and the Club's audience of business executives, his decision seems an inevitable result of his reading the book. BOMC immediately notified P–H of its decision not to distribute the book. The reason given was BOMC's belief that the book was malicious and had an objectionable tone.

P–H's own detailed examination of the manuscript may also have introduced or heightened skepticism on Grenquist's part. A toning down was found to be necessary even after the book was in page proof. Mistakes of fact, such as a statement that Irving S. Shapiro (DuPont's Chief Executive Officer) had served as an Assistant District Attorney in Queens County, New

York, were discovered. More serious matters also came to light. The original manuscript attacked Judge Harold R. Medina for matters irrelevant to the DuPonts and in a fashion which the district court characterized as libelous. Zilg admitted at trial that there was no factual foundation for this attack. Some eyebrows at P–H may well have been raised when this passage was discovered and deleted, since it was not only unfounded but also irrelevant.

P–H continued to correct and tone down the book, hoping to reverse BOMC's decision not to offer it through the Fortune Book Club. A certain defensiveness also began to creep into P–H's attitude toward the book. On August 2, Grenquist circulated a memorandum which noted that questions had arisen regarding both the tone of the book and Zilg's approach and recommended that the adjective "polemical" henceforth be used because "[t]he book is a polemical argument and no pretense is made that it is anything else." More importantly, he also cut the first printing from 15,000 copies to 10,000, stating that 5,000 copies were no longer needed for BOMC. The proposed advertising budget was also slashed from $15,000 to $5,500.

Judge Brieant held that the DuPont Company had a constitutionally protected interest in bringing the "scurrilous" nature of the book and its unsuitability as a Fortune Book Club selection to the attention of senior officials at BOMC and P–H. He expressly found that the Company did not engage in coercive tactics but limited its actions to the expression of its good faith opinion.

As to P–H, Judge Brieant found that the publishing contract required the publisher to "exercise its discretion in good faith in planning its promotion of the Book, and in revising its plans." This obligation required that Prentice-Hall use "its best efforts ... to promote the Book fully and fairly." He held that P–H breached this obligation because it had no "sound" or "valid" business reason for reducing the first printing by 5,000 volumes and the advertising budget by $9,500, which allowed

the book to go briefly out of stock (although wholesalers had ample copies) just as it gained sales momentum. He expressly found that since BOMC did its own printing of club selections, the first printing cut could not be attributed to the cancellation of the BOMC order. He also found that the book would have sold 25,000 copies had P–H not taken these actions.

Having concluded that P–H had no sound or valid business reason for reducing the first printing and advertising budget, Judge Brieant held that P–H "privished" Zilg's book on the basis of the testimony of plaintiff's expert, William Decker. Decker testified that publishers often mount a wholly inadequate merchandising effort after concluding that a book does not meet prior expectations in either quality or marketability. Such "privishing" is intended to fulfill the technical requirements of the contract to publish but to avoid adding to one's losses by throwing "good money after bad."

## DISCUSSION

We agree with Judge Brieant that DuPont did not tortiously interfere with Zilg's beneficial commercial relationships. We disagree, however, with his conclusion that P–H breached its contract with Zilg and reverse that judgment.

### 1. Tortious Interference by DuPont

Judge Brieant held that DuPont's approach to BOMC and subsequent communications with P–H were protected by the First Amendment. We affirm, but on the narrower grounds that these activities are not tortious under New York law.

The parties agree that New York law applies and that New York courts would follow the Restatement (Second) of Torts (1977). *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980). The Restatement visits tort liability upon an actor who "intentionally and improperly" interferes with contractual relations between others by causing a party to those relations not to perform. Restatement (Second) of Torts § 766 (1977). We

will assume that DuPont's actions were a cause in fact of BOMC's decision not to offer the book as a Fortune Book Club selection and of P–H's alleged breach of contract. We now turn to the propriety of DuPont's conduct.

Section 767 of the Restatement catalogues the factors considered in evaluating the propriety of interference with contractual relations. The section reads:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

■ As to section 767(a), the nature of the DuPont Company's conduct, Judge Brieant found that it did not entail threats of economic coercion or baseless litigation but was limited to a good faith expression of views about the merits, objectivity and accuracy of the book. We agree. The length and breadth of the evidence of economic coercion is a conversation between two parties without firsthand knowledge, which only one recalls. Moreover, it involved Time, Inc., which had nothing to do with publication or distribution of the book. As to threats of litigation, DuPont did convey to BOMC its view that the work was "actionable." Since BOMC was completely indemnified under its contract with P–H, it is unlikely that the remark, made only to BOMC, was coercive to BOMC. In any event, representatives of the DuPont Company quickly informed both BOMC and P–H that it had no intention of suing.

As to section 767(b), the DuPont Company's motive, the record amply demonstrates that it desired to bring to the attention of BOMC and, later P–H, what it in good faith believed were plainly negative aspects of the book. It wanted to expose those negative aspects in the hope of causing BOMC to abandon its plans and of inducing P–H to reconsider publication without substantial revision.

Zilg just as clearly had an interest, section 767(c) in the Restatement, in avoiding these very consequences since publication under his contract with P–H and selection by the Fortune Book Club (assuming, without deciding, that relationship to be contractual) would enhance the dissemination of his views, enrich him, and might also launch him on a career as a well known author.

■ Conversely, the DuPont Company had a substantial interest, section 767(d), in communicating its views to BOMC and to P–H. While much of the book's accusatorial material related to specific family members, the company itself could reasonably believe that it might suffer damage to its public image and good will if the book was given widespread credence. For most of the period covered by the book the company was controlled and operated by various members of the family who are the subjects of Zilg's attacks. The title itself, *DuPont: Behind the Nylon Curtain,* seems more a reference to the company than to the family. The index contains roughly one half of one page of small print references to the company and the book suggests that the company is guilty of ongoing antitrust violations. The book also contains an attack on Irving Shapiro, at publication time the company's Chairman of the Board, but not a DuPont family member, which states, *inter alia,* that he was "of witch-hunting fame during the McCarthy era," that "his story is one of success through persecution and disgrace" and that he "never relented on these sorry days," descriptions arrived at as a consequence of Shapiro's role as an Assistant United States Attorney in a Smith Act trial. We regard Zilg's argument that only

family members had a cognizable interest in commenting on the book as ignoring the reality of the circumstances and the character of the book itself.

The author of this opinion respectfully disagrees with Judges Waterman and Pierce that the inquiry required by Restatement section 767(e), the interests of society, is satisfied by the finding that DuPont acted in good faith and in a non-coercive manner in pursuing its interest in protecting its name. If that were the case, there would be no need for a subsection (e) since it would be adequately covered by subsections (a) and (d). I believe, therefore, that a particularized discussion of the interests of society in promoting or deterring the communication of good faith views about the merits of a literary work to publishers and book clubs is necessary.

Such communications seem to me socially beneficial because they promote the free flow of ideas. Zilg argues that such communications should be privileged only when made to the public at large. I see no basis for such a limitation. There is no self-evident harm in book clubs and publishing houses learning what the targets of a harsh "polemical argument" believe about the merits of that argument. Such firms surely have, or ought to have, an interest in avoiding unjustified attacks as well as factual error, and such information aids in achieving those goals. It is amply clear in the record that book clubs and publishing houses are not monolithic organizations which immediately absorb all relevant information and distribute it evenly throughout the firm hierarchy. Rather, they are overworked bureaucracies which channel information selectively and can be prone to error because of scant or inaccurate information.

This seems to have been the case at P–H, for both Cavin's enthusiasm and the wholly misleading signal from the Fortune Book Club appear to have misled Grenquist and perhaps others as to the character of the book and the highly negative response it would meet in some quarters. Certainly the book was something other than the original proposal's description of a "story

... of money and power ... told in human terms and in the lives of the members of the family and their actions." Moreover, once Grenquist was apprised of the problems of tone and factual inaccuracies, P–H revised the book with Zilg's permission.

As to BOMC and Fortune Book Club, there can be no doubt of their interest in receiving the communication from the DuPont Company since the book was an utterly inappropriate selection for the Club. Book clubs have a strong interest in avoiding the wrath of their members and such communications further this interest.

Society benefits from such communications because they increase the information available to publishers and book clubs and thus aid those firms in meeting the desires of potential purchasers. The reading public has an interest both in the accuracy and literary merit of available books and in an efficient means of learning about works of particular interest to particular readers. To the extent that targets of "polemical argument" are able to communicate with publishers, accuracy and merit may be enhanced. To the extent they are able to communicate with book clubs, particular readers are more likely to be exposed to accurately pre-selected items of interest to them.

As to section 767(f) and (g), the DuPont Company's actions surely resulted in BOMC's decision not to distribute the book as a Fortune Book Club selection and, either because of its direct communications to P–H or the BOMC decision, caused the change in Grenquist's attitude toward the book. So far as the relations of the parties are concerned, it is enough to note that Zilg fully intended his work to be the harsh attack it was.

■ After weighing the factors comprising section 767, we hold that the DuPont Company's conduct in communicating its views on Zilg's book was not tortious. Authors have no exclusive right to the ear of those who disseminate their works, for intelligent decisions by publishers and others distributing books are enhanced by the free flow of information. So long as the expres-

sion of views is done in good faith and in a non-coercive way, it is not tortious. This result is fully supported by our recent decision in *Hammerhead Enterprises, Inc. v. Brezenoff,* 707 F.2d 33 (2d Cir.1983), holding that the First Amendment protects communications by a municipal welfare official to department stores asking them not to stock a parlor game mocking the system of public assistance.

## 2. P–H's Breach of Contract

We believe Judge Brieant's discussion of P–H's obligations under its contract with Zilg, and his finding of a breach of those obligations, is more troubling than his dismissal of the case against the DuPont Company. Judge Brieant read the contract in question to oblige P–H "to use its best efforts ... to promote the Book fully...." and found that the decision to cut the first printing and original advertising budget resulted in a loss of sales momentum when the book was briefly out of stock. These actions by P–H, he held, breached its agreement with Zilg because they lacked a sound or valid business reason.

■ Putting aside for the moment P–H's motive in slashing the first printing and advertising budget, we note that Zilg neither bargained for nor acquired an explicit "best efforts" or "promote fully" promise, much less an agreement to make certain specific promotional efforts. The contract here thus contrasts with that in issue in *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918 (2d Cir.1977), which contained specific promotional obligations with regard to a musical group. While P–H obligated itself to "publish" the book once it had accepted it, the contract expressly leaves to P–H's discretion printing and advertising decisions. Working as we must in the context of a surprising absence of caselaw on the meaning of this not uncommon agreement, we believe that the contract in question establishes a relationship between the publisher and author which implies an obligation upon the former to make certain efforts in publishing a book it has accepted notwithstanding the clause

which leaves the number of volumes to be printed and the advertising budget to the publisher's discretion. This obligation is derived both from the common expectations of parties to such agreements and from the relationship of those parties as structured by the contract. *See generally* Goetz and Scott, *Principles of Relational Contracts,* 67 Va.L.Rev. 1089 (1981).

Zilg, like most authors, sought to take advantage of a division of labor in which firms specialize in publishing works written by authors who are not employees of the firm. Under contracts such as the one before us, publishing firms print, advertise and distribute books at their own expense. In return for performing these tasks and for bearing the risk of a book's failure to sell, the author gives a publisher exclusive rights to the book with certain reservations not important here. Such contracts provide for royalties on sales to the author, often on an escalating basis, *i.e.,* higher royalties at higher levels of sales.

While publishers and authors have generally similar goals, differences in perspective and resulting perceptions are inevitable. An author usually has a bigger stake in the success or failure of a book than a publisher who may regard it as one among many publications, some of which may lose money. The author, whose eggs are in one basket, thus has a calculus of risk quite different from the publisher so far as costly promotional expenditures are concerned. The publisher, of course, views the author's willingness to take large risks as a function of the fact that it is the publisher's money at peril. Moreover, the publisher will inevitably regard his or her judgment as to marketing conditions as greatly superior to that of a particular author.

One means of reconciling these differing viewpoints is "up-front" money—$6,500 in Zilg's case—which provides a token of the publisher's seriousness about the book. Were such sums not bargained for, acquisition of publishing rights would be virtually costless and firms would acquire those rights without regard to whether or not they had truly decided to publish the work.

However, up-front money alone cannot fully reconcile the conflicting interests of the parties. Uncertainty surrounds the publication of most books and publishers must be cautious about the size of up-front payments since they increase the already considerable economic risks they take by printing and promoting books at their own expense. Negotiating such matters as the number of volumes to be printed and the level of advertising efforts might be possible but such bargaining in the case of each author and each book would be enormously costly. There is never a guarantee of ultimate agreement, and if a set of negotiations fails over these issues, the bargaining must begin again with another publisher. Moreover, publishers must also be wary of undertaking obligations to print a certain number of volumes or to spend fixed sums on promotion. They will strongly prefer to have flexibility in reacting to actual marketing conditions according to their own experience.

The contract between Zilg and P–H was a printed form with formal and negotiated matters—e.g., the parties' names and the amount of the advance to the author—typed in. Under the terms of the printed form, once P–H accepted the manuscript it was obliged to publish the book but had discretion to determine the number of volumes to be printed and the level of advertising expenditures. These clauses are, of course, interrelated and the extent to which the language regarding promotional efforts and the promise to publish modify each other is the central issue before us. In resolving it, we must attempt to preserve the major interests of both parties. *Sharon Steel Corp. v. Chase Manhattan Bank,* 691 F.2d 1039 (2d Cir.1982).

■ Once P–H had accepted the book, it obtained the exclusive right to publish it. Were the clause empowering the publisher to determine promotional expenses read literally, the contract would allow a publisher to refuse to print or distribute any copies of a book while having exclusive rights to it. In effect, authors would be guaranteed nothing but whatever up-front money had

been negotiated, and the promise to publish would be meaningless. We think the promise to publish must be given some content and that it implies a good faith effort to promote the book including a first printing and advertising budget adequate to give the book a reasonable chance of achieving market success in light of the subject matter and likely audience. *See Contemporary Mission, Inc. v. Famous Music Corp.; cf. Van Valkenburgh Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329 (1972) (publication of competing works may be so foreseeably harmful to author's royalties as to breach covenant to promote the book).

However, the clause empowering the publisher to decide in its discretion upon the number of volumes printed and the level of promotional expenditures must also be given some content. If a trier of fact is free to determine whether such decisions are sound or valid, the publisher's ability to rely upon its own experience and judgment in marketing books will be seriously hampered. We believe that once the obligation to undertake reasonable initial promotional activities has been fulfilled, the contractual language dictates that a business decision by the publisher to limit the size of a printing or advertising budget is not subject to second guessing by a trier of fact as to whether it is sound or valid.

The line we draw reconciles the legitimate conflicting interests of publisher and author as reflected in the contractual language, for it compels the publisher to make a good faith effort to promote the book initially whether or not it has had second thoughts while relying upon the profit motive thereafter to create the incentive for more elaborate promotional efforts. Once the initial obligation is fulfilled, all that is required is a good faith business judgment. This is not an interpretation harmful to authors. Were courts to impose rigorous requirements as to promotional efforts, publishers would of necessity undertake to publish fewer books with unpredictable futures.

Given the line we draw, a breach of contract might be proven by Zilg in two ways. First, he might demonstrate that the initial printing and promotional efforts were so inadequate as not to give the book a reasonable chance to catch on with the reading public. Second, he might show that even greater printing and promotional efforts were not undertaken for reasons other than a good faith business judgment. Because he has shown neither, we reverse the judgment in his favor.

■ As to P–H's initial obligation, Zilg has not shown that P–H's efforts on behalf of his book did not give it a reasonable chance to catch on with the reading public. It printed or reprinted 13,000 volumes (3,000 over the volume of sales at which the highest royalty was triggered), authorized an advertising budget of $5,500 (1974 purchasing power), distributed over 600 copies to reviewers, purchased ads in papers such as the *New York Times* and *Wall Street Journal,* and made reasonable efforts to sell the paperback rights. The documentary record shows that Grenquist took a continued interest in marketing the book, made suggestions as to promoting it effectively and ordered that "rave reviews" be sent to BOMC as late as January, 1975.

The fact that initial decisions as to promotional efforts were trimmed is of no relevance absent evidence that the actual efforts made were so inadequate that the book did not have a reasonable chance to catch on with the reading public. The record is barren of such evidence. P–H's estimates of first year sales made at the peak of the book's standing within the firm were only 12,000–15,000. By May, before the BOMC reversal, the low estimate was 10,-000. It can hardly be contended that an initial printing of 10,000 and reprinting of 3,000 is so low that it breaches the obligation to give the book a reasonable chance to sell. Plaintiff's expert, Decker, himself testified that these efforts were "perfectly adequate," although they were "routine" and P–H "did not follow through as they might have."

Judge Brieant found only that an "unexplained" reduction in the first printing and advertising budget caused the book to go out of stock for a brief period of time and prevented the exploitation of growing sales momentum. He thus did not find that P–H's promotional efforts gave the book no reasonable chance to sell. Rather, he found that sales momentum was generated but not adequately exploited because the book was briefly out of stock. That situation, however, was not an inevitable outcome of the size of the first printing since a timely reprinting would have prevented it. Indeed, Grenquist ordered a reprinting when over 10% of the original volumes were still in stock and a delivery delay in that reprinting led to the three week out of stock situation. Moreover, the book was always available from wholesalers although, as Judge Brieant found, book sellers prefer to buy from publishers who provide a discount.

■ The district court read the contract as imposing on P–H a continuing obligation to use "its best efforts ... to promote the Book fully and fairly" and as . empowering a trier of fact to second guess a publisher's judgments as to the soundness of the decisions made. We disagree. So long as the initial promotional efforts are adequate under the test we outline above, a publisher's printing and advertising decisions do not breach a contract such as that before us unless the plaintiff proves that the motivation underlying those decisions was not a good faith business judgment. Zilg failed to produce such evidence. His case was based on the theory that economic coercion by the DuPont Company caused P–H to reduce its promotional efforts. Judge Brieant found against him on this issue and, for reasons stated above, we affirm this determination.

This district court's finding that the reduction of promotional efforts was not based on a sound or valid business reason thus does not support the conclusion that the contract was breached. The district court took a different view of the legal obligations imposed by the contract and its conclusion was based on its highly optimis-

tic opinion of the marketability of Zilg's book. Even at the peak of the book's standing within P–H, at a time when the Fortune Book Club was going to offer it as a selection and before the problems of tone and accuracy had come into focus, no one at P–H save Cavin thought the book would be as successful as the district court later found. P–H's March, 1974, estimate for five year sales, for example, was 15,000 to 20,000, the low estimate being closer to actual sales than the high estimate is to Judge Brieant's finding. Indeed, Judge Brieant's view of the book's potential is entirely inconsistent with Decker's definition of privishing—not throwing "good money after bad"—for he in essence found that P–H had managed to avoid a small bonanza by breaching its contract.

As explained above, we think the contract between P–H and Zilg left the decisions in question to the business judgment of the publisher, the author's protection being in the publisher's experience, judgment and quest for profits. P–H's promotional efforts were, in Decker's words, "adequate," notwithstanding the reduction of the first printing and the initial advertising budget. Indeed, those reductions, coming on the heels of BOMC's decision not to distribute the book, appear to be a rational reaction to that news. Decker himself testified that the Fortune Book Club selection was an important barometer of marketability since it was an independent judgment that the book had an audience. Zilg's contract with P–H did not compel the publisher to ignore the implications of BOMC's change of heart.

Affirmed in part, reversed in part.

WATERMAN, Circuit Judge (concurring):

I concur in the result reached by Judge Winter and in most of that opinion. However, as to that portion of the opinion written by Judge Winter to which Judge Pierce has written a concurring opinion I concur in the concurring opinion of Judge Pierce.

PIERCE, Circuit Judge (concurring):

I am in agreement with the result reached in Judge Winter's able opinion. Thus, I respectfully concur, but I reach the same conclusions on narrower grounds.

■ My concurrence is directed to that portion of the opinion addressing Zilg's claim of tortious interference by DuPont. Recognizing that applicable law requires a showing of "intentional and improper" interference with a contract before tort liability may be visited upon a defendant, Restatement (Second) of Torts § 766 (1977), I consider the pivotal facts in this case to be the district court's findings—fully supported by the record evidence—that, in effect, DuPont's communications to BOMC concerning alleged inaccuracies in the book were made in good faith and were non-coercive. See Opinion of Judge Brieant at 48–49, 53. In my view, these findings are a "chief factor" in determining whether DuPont's actions were improper. See Guard-Life Corp. v. S. Parker Hardware Mfg., 50 N.Y.2d 183, 190, 406 N.E.2d 445, 448, 428 N.Y.S.2d 628, 632; see also Restatement (Second) of Torts § 767(a).

As to the analysis of Restatement (Second) of Torts § 767(e) (interests of society), I believe it suffices to say that because DuPont's communications to BOMC constituted a good faith, non-coercive pursuit of its interest in protecting its name, DuPont's conduct was not socially undesirable. Since we find no error as to the pivotal factual findings on this point, measured by the factor enunciated in Restatement § 767(e), those findings clearly weigh in DuPont's favor on the question of tort liability herein.

■ Because DuPont's conduct in this case was found to be undertaken in good faith and was non-coercive, I conclude that DuPont committed no tort by communicating to BOMC its concerns about the accuracy of the book. Moreover, the determination of no contractual breach alone would suggest DuPont's non-liability for tort, since under New York law, breach of the contract allegedly interfered with is an es-

sential element of the tort claimed herein. *See Jack L. Inselman & Co. v. FNB Financial Co.,* 41 N.Y.2d 1078, 1080, 364 N.E.2d 1119, 1120, 396 N.Y.S.2d 347, 349 (1977).

I concur in the result reached by Judge Winter.