**Gail PERRY, Plaintiff,**

**v.**

**McGRAW–HILL, INC., Defendant.**

**No. 88 Civ. 3561 (RO).**

United States District Court, S.D. New York.

June 6, 1997.

---

Hill, Betts & Nash L.L.P. (Peter J. McHugh, Steven A. Lucia, of counsel), New York City, for Plaintiff.

Schwab Goldberg Price & Dannay (David O. Carson, of counsel), New York City, for Defendant.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff is the widow of Dr. Robert Perry, who was the editor of the *Chemical Engineers' Handbook* until his death. In 1956, Dr. Perry, his co-editors at that time, and defendant-publisher McGraw–Hill signed a one page agreement governing the Handbook's publication. The 1956 Agreement was in force when Dr. Perry died in 1978, at which time he was preparing the Handbook's sixth edition. Plaintiff became the successor-in-interest to Dr. Perry's rights in the Handbook. In 1980, she and defendant agreed to amend the 1956 Agreement with respect to the sixth and all future editions. It is important to note that both the 1956 Agreement and the 1980 Amendment are silent as to which party has control over the marketing and promotion of the Handbook.

Plaintiff's suit alleges breach of the contractual duty of good faith and fair dealing with regard to marketing the Handbook. Defendant moves for summary judgment on the first cause of action of the amended complaint.

Plaintiff asserts her first cause of action under two theories. First, plaintiff asserts that the prior course of dealing in writing between Dr. Perry and defendant under the 1956 Agreement established Dr. Perry's contractual right to control the marketing of the Handbook and that this right of control survived the 1980 Amendment. She claims the right was later violated by defendant, namely by instituting immediate sales to book clubs, immediate direct marketing sales, promotional/discount sales and sales of International Student Editions in "developed foreign countries". Under plaintiff's second theory she alleges that she signed the 1980 Amendment in October of that year in reliance on a statement made by defendant in a May 1980 letter regarding its plans for direct mail sales. She alleges that this statement has the force of a contractual promise and that it was breached by defendant's subsequent decision to emphasize direct mail sales, which pay a lower royalty than sales through other mediums. I will address each theory in turn, noting at the outset that they both require me to decide as a matter of law what conclusion to draw from contractual silence regarding who, as between Dr. Perry and defendant, has the right to control the marketing and promotion of the Handbook.

The interpretation of a contract is generally a question of law to be determined by the district court. *Goodheart Clothing Co., Inc. v. Laura Goodman Enterprises, Inc.,* 962 F.2d 268, 273 (2d Cir.1992). "A contract must be interpreted to give effect to the intent of the parties." *U.S. v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991). "Where the language of a contract is unambiguous, the parties' intent is discerned from the four corners of the contract." *Id.* at 77. "The determination of whether contract language is ambiguous is a question of law." *Werbungs Und Commerz Union Austalt v. Collectors' Guild Ltd.,* 930 F.2d 1021, 1025 (2d Cir.1991).

When the 1956 Agreement was signed, defendant did not yet have its Chemical Engineers' Book Club ("Book Club"). After defendant established the Book Club, it wanted to include the Handbook as a selection, but felt that the royalty it would have to pay Dr. Perry under the 1956 Agreement made it economically infeasible to do so.[1] Plaintiff has submitted a series of letters which defendant and Dr. Perry exchanged from August 1973 through April 1974 regarding defendant's use of the Handbook in the Book Club.[2] The first piece of correspondence plaintiff proffers is a form letter from defendant to Dr. Perry dated August 21, 1973 which reads in part:

> I think you'll be as pleased as I to learn that our Book Club Program would very much like to use the new fifth edition of your CHEMICAL ENGINEERS' HANDBOOK as an offering in the Chemical Engineers' Book Club very soon. No doubt you'll recall that we have been offering the fourth edition to Club members for the past few years. . . .

> Our present arrangement is to pay you—on the extra sales achieved through the Club efforts—one-half your current royalty rate, based on the net price of the book to members. The reason for a lower royalty rate at all is, of course, that the book clubs must offer subscribers a discount. In addition, the cost of book club sales is considerably higher than the cost of textbook sales and regular mail or trade sales. Thus, in book club sales, both the publisher and the author sacrifice a normal percentage per copy in return for increased dollar sales and royalties. This, as you know, is essentially the principle we have in effect for foreign sales, where we settle for less per copy in return for greater volume.

> If this plan meets with your approval, I would appreciate your signing both copies of this letter and returning one copy to us.

Plaintiff also points to the similar form letter that Dr. Perry finally agreed to sign in April 1977, along with his handwritten phrase "Permission does not include later editions." Plaintiff now claims that these and other letters create her continuing right to control the Handbook's marketing by virtue of an established custom and practice under the 1956 Agreement and that defendant's subsequent marketing decisions violated that right.

Defendant responds that although the letters reflect a courtesy defendant extended to certain important authors by asking to use their book as a Book Club selection before actually doing so, they are in essence a request that Dr. Perry accept a lower royalty rate on such sales than provided for in the 1956 Agreement. Defendant observes that absent such consent, it was economically infeasible for McGraw–Hill to sell the Handbook through the Book Club. In fact, Dr. Perry's refusal to accede to such pleas until 1977 meant that defendant chose not to sell the Handbook through the Book Club, but this does not rise to the level of a contractual right to control marketing on the part of Dr. Perry, for obviously, McGraw–Hill could have marketed the Handbook in this area by paying Dr. Perry the full royalty but at a loss to itself.

1. The 1956 Agreement set a royalty rate for sales to "recognized" book clubs. Since defendant did not have an in-house chemical engineer's book club at the time the 1956 Agreement was executed, it arguably could have been required to pay the rate established for sales to "recognized" book clubs of 7.5% of the retail selling price of all copies actually sold. The lower rate sought by defendant in several form letters proffered by plaintiff was 7.5% of the net price of the book to club members. The 1980 Agreement establishes a new royalty rate of 5% of defendant's net receipts for each copy of the Handbook sold through defendant's book club. Net receipts is defined in the 1980 Amendment as "the Publisher's selling price less discounts, credits, and returns, or a reasonable reserve for returns."

2. I discuss this and other extrinsic evidence offered by plaintiff only because she has proffered it as clarifying the meaning of the contract. I conclude, however, that it does not, and recognize the principle that extrinsic evidence is not relevant unless a contract is ambiguous as to a particular term. Here the contract is silent, not ambiguous, as to who controls the marketing of the Handbook, thereby negating plaintiff's contention that the interpretation of the contract should come from extrinsic evidence, rather than "from the common expectations of parties to such agreements and from the relationship of those parties as structured by the contract." *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679 (2d Cir.1983).

In support of this interpretation, defendant presents an affidavit from Mr. Harold Crawford, who in 1970 became the sponsoring editor of all of defendant's professional engineering, technical and business handbooks, including the handbook edited by Dr. Perry. In this position, Mr. Crawford conducted contract negotiations and served as the liaison between defendant and Dr. Perry when the Handbook was in its fourth edition. Mr. Crawford explained that these form letters were sent as a courtesy to Dr. Perry, not out of any perceived right to control marketing granted to Dr. Perry under the 1956 Agreement. Defendant next contends in the alternative that even if the letters create such a right, it did not survive the 1980 Amendment to the 1956 Agreement.

■ I conclude that the form letters offered by plaintiff do not constitute a course of conduct which established Dr. Perry's continuing contractual right to control the marketing of the Handbook. Further, even if the letters did establish such a right prior to the 1980 Amendment, that right did not survive the 1980 Amendment. This is clear not only from the 1980 Amendment itself but also from the conduct of plaintiff and communications with her then-attorney, Mr. John Taylor Williams, leading up to the execution of the Amendment. On June 26, 1980, Mr. Crawford wrote Mr. Williams as follows:

> Kurt asked me to respond directly to a remaining question on our marketing activities once the Sixth Edition is published. Here are our intentions:
>
> 1. The new edition will be promoted in *all marketing areas* with new vigor....
>
> 2. We expect to increase sales by means of a special push from the date of publication by our Chemical Engineers' Book Club....
>
> 3. Our standard mail order activity should continue to grow....
>
> 4. ... As you know, our International Book Company makes available to certain underdeveloped areas an International Student Edition (a more inexpensively produced edition printed in Japan)....

> 5. As mentioned above, bookstore sales should increase by means of a greater marketing thrust in our book club and mail order activities.

Plaintiff did not like what she read in either letter. She wrote Mr. Williams expressing her concern:

> When I read Hal Crawford's letter regarding McGH's marketing intentions, however, I was filled with foreboding and annoyance. Have I, as Consultant, no rights, as Bob did over when book club sales begin?
>
> ...
>
> I have not signed the agreements.... Have we any legal leverage?

Mr. Williams was asked at his deposition, "[D]id you ever advise Mrs. Perry as to whether signing the contract without resolving the book club issue might deprive her of any right to be involved in decisions about timing of book club sales?" He responded,

> Yes ... As best I can recall, my advice to her was that technically the contract did not empower her to consult or withhold her approval on marketing specifically, but that in light of the long relationship that she and her husband had had with McGraw–Hill and the Perry family generally ... that I was prepared to rely upon the letter of counsel. But I did advise her that it was not as technically legally authoritative as it might have been if it were incorporated in the contract.

Nonetheless, plaintiff never asked defendant to change the Amendment to reflect her concerns about marketing, but instead signed it in October of 1980 in its original form.

In light of the foregoing, plaintiff cannot contend now that she relied on any past practice that may have been instituted with respect to her husband as the source for her continuing right to control marketing, when her lawyer specifically advised her to the contrary *before* she signed the Amendment. This holds true as well for control over the use of the Handbook in the Book Club, the marketing plan for direct mail sales of the Handbook,[3] the use of the Handbook as a

---

3. The complaint is also silent as to who controls the marketing of the Handbook through direct

mail sales. During the course of negotiations in 1980, plaintiff had inquired as to defendant's

premium[4] and the publication of a less expensive student edition sold abroad.[5] As the Second Circuit stated in *Viacom International, Inc. v. Tandem Productions, Inc.,* 526 F.2d 593, 596 (2d Cir.1975):

> The district court properly explored the parties' intended meaning of the term 'assignment' and determined that Tandem signed the written agreement with full knowledge that CBS intended to assign the distribution and syndication rights to Viacom. We find no error in the district court's eminently sensible determination that all parties knew that the assignment of distribution rights would include the concurrent delegation of distributorship duties.

■ Further, in the absence of specific contractual provisions, it is common sense and trade practice that as between an author and a publisher, the publisher controls marketing and promotion. The recognition of this is implicit in *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671 (2d Cir.1983). Accordingly, summary judgment is granted to defendant on plaintiff's first cause of action and it is hereby dismissed on the law.

So ordered.

plans for marketing the sixth edition of the Handbook. Defendant's in-house counsel, Kurt Steele wrote Mr. Williams in response on May 2, 1980 as follows: "As for mail sales, Hal Crawford advises that McGraw–Hill has no plans to change the thrust of marketing for the Handbook and that sales to retail stores will continue to be emphasized as they are now." This is not a basis for plaintiff's alleged right to control direct mail sales in light of the June 26, 1980 letter which stated that "standard mail order activity should continue to grow" and her subsequent discussions with counsel described above.

4. Plaintiff claims that defendant did not have the right, without first obtaining her permission, to use the Handbook for "premium sales", whereby a book is sold for a low price or given away for free in exchange for joining the Book Club. She bases her claim on the fact that her husband "did not believe in giving his author's share [of royalties] away" and that during the negotiations in 1980, defendant proposed a separate royalty category for premium sales which was ultimately not included in the final version of the 1980 Amendment. She cannot succeed on this part of her claim, however, because neither the 1956 Agreement nor the 1980 Amendment place any restrictions on the price at which defendant can sell the Handbook through its Book Club and because defendant's decision to give the Handbook free to new Book Club members is authorized by the 1980 Amendment, which explicitly provides that "No royalty or other payment shall be due for ... any copies of the Work ... furnished by the Publisher to others without payment for the purposes of promotion or publicity or *for any other purpose deemed appropriate by the Publisher in its sole discretion.*" (emphasis added).

5. The publishing agreement as amended does not explicitly reserve control over where the international student edition could be sold. Plaintiff claims that certain letters that defendant sent to her husband led them both to believe that the lower priced international student edition was only being sold in "developing countries". But there are other letters which mention selling the lower priced edition to students generally, regardless of the country in which they live. As discussed below, one can assume that if the normal delegation of duties between author and publisher was to have been altered in this case to give Dr. Perry or plaintiff control over the student edition, then it would have been explicitly bargained for and memorialized in the contract.