UNITED STATES of America, Plaintiff,

and

Yonkers Branch-National Association
for the Advancement of Colored
People, et al., Plaintiffs-Intervenors,

v.

YONKERS BOARD OF EDUCATION,
City of Yonkers, and Yonkers Commu-
nity Development Agency, Defendants.

CITY OF YONKERS and Yonkers
Community Development Agency,
Third-Party Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOP-
MENT, and Secretary of Housing and
Urban Development, Third-Party De-
fendants.

No. 80 CIV 6761 (LBS).

United States District Court,
S.D. New York.

June 17, 1985.

United States Dept. of Justice, Civ. Div., Raymond M. Larizza, Washington, D.C., for third-party defendant Dept. of Housing & Urban Development.

Michael H. Sussman, Brooklyn, N.Y., for plaintiffs-intervenors N.A.A.C.P.

Vedder, Price, Kaufman, Kammholz & Day, Michael W. Sculnick, New York City, for defendants City of Yonkers and Yonkers Community Development Agency.

SAND, District Judge.

This action was brought by the United States against the City of Yonkers, the Yonkers Community Development Agency (collectively "the City") and the Yonkers Board of Education, alleging violations of Title IV and VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, and the Fourteenth Amendment, in

the administration of Yonkers' public school system and public housing programs. Soon thereafter, the Yonkers Branch of the National Association for the Advancement of Colored People and Charlotte Ryer, as class representative of the black residents of Yonkers, intervened as party-plaintiffs against the City and the Board of Education, and subsequently asserted a claim against the Department of Housing and Urban Development (HUD) as well. Plaintiff-intervenors' claim against HUD was settled by a Consent Decree approved by this Court on March 19, 1984.[1]

The terms of the Consent Decree, in broad outline, require HUD to make available 200 units of family and large family public housing to be located east of the Saw Mill River Parkway within the City of Yonkers (hereinafter "East Yonkers"), and 175 family certificates under the Section 8 Existing Housing Program, which, for the first 120 days following their receipt by eligible families, would be valid for use only in buildings in East Yonkers.[2] Plaintiff-intervenors contend that HUD has failed to fulfill its obligations with respect to both the public housing units and the Section 8 Existing Certificates. This Opinion addresses plaintiff-intervenors' claim with respect to the Section 8 Existing Certificates.

### The Terms of the Decree

The Consent Decree provides that "[w]ithin 45 days of the date upon which this Consent Decree is entered by the court, HUD will invite the [Yonkers Metropolitan Housing Authority (hereinafter "MHA")] to submit an application for one hundred and seventy-five (175) family certificates under the Section 8 Existing Housing Program." Consent Decree, para. (11). The Decree further provides that as a condition of the receipt of the certificates, "HUD shall require that for the first one hundred and twenty days following the re-

ceipt by a family of a certificate, the MHA shall permit the family to use the certificate to obtain qualified housing only in buildings east of the Saw Mill River Parkway in the City of Yonkers." Id. at para. (12). After 120 days, if a certificate holder is unable to locate qualified housing in East Yonkers, the certificate can then be used anywhere in the City of Yonkers. Id. For two years following HUD's provision of the Section 8 certificates to the MHA, HUD is required to conduct and file with the plaintiff-intervenors quarterly reviews of the use of the certificates. Id. at para. (13).

In addition, HUD is required to "notify the MHA that it expects that agency to make all diligent efforts to assist eligible families to find housing in East Yonkers under the Section 8 Existing Program." Id. at para. (15). HUD must also "require the MHA to inform eligible applicants as to the nature of" the 175 Section 8 Existing Certificates made available under the Consent Decree, and must provide applicants with the name and telephone number of a HUD employee to whom complaints may be directed concerning any "lack of cooperation by the MHA ..." Id. HUD is to provide to plaintiff-intervenors on a quarterly basis "its findings concerning the efforts of the MHA to ... utilize the Section 8 Existing Certificates and any recommendations made by HUD to the MHA to improve the utilization rates" of the certificates. Id. HUD is also to report on a quarterly basis any complaints it has received from applicants and the steps taken to resolve them. Id.

### Actions Taken to Date and the Claims of the Consent Decree Parties

On May 3, 1984, forty-five days after this Court approved the Consent Decree, HUD notified the MHA that "HUD will accept an application by your Authority to administer a Section 8 Existing Housing Program in the City of Yonkers for 175 2–BR family

---

**1.** The trial of the case-in-chief has been completed, and is at present under submission to the Court. A counterclaim and third-party complaint filed against HUD by the City were dismissed by the Court on September 18, 1984.

*See United States v. Yonkers Board of Education,* 594 F.Supp. 466 (S.D.N.Y.1984).

**2.** The complete text of the Consent Decree is reproduced in an Appendix to this Opinion.

units." Letter of George M. Beaton, Acting Regional Administrator/Regional Housing Commissioner, New York Regional Office, HUD, to Emmett Burke, Chairman of the Board, MHA [hereinafter "Beaton Letter"], Attachment 3 to Plaintiff-intervenors' Motion for an Order Requiring HUD to Adhere to the Terms of the Consent Decree [hereinafter "Plaintiff-intervenors' Motion"].[3] On June 14, 1984, the MHA submitted an application for the Section 8 Existing Certificates together with an application for the 200 units of public housing also made available by the Decree. *See* Letter of Peter Smith, Secretary-Director, MHA, to Joseph Monticciolo, Regional Administrator-Regional Housing Commissioner, New York Regional Office, HUD, Attachment 4 to Plaintiff-intervenors' Motion.

HUD has yet to take any formal action with respect to the MHA's Section 8 application. On July 3, 1984, a passing reference to the application was made in a letter to the City Manager of Yonkers from HUD's Office of Community Planning and Development for Region II [hereinafter "the Cruise Letter"]. The letter notified the City that the approval of its application to participate in HUD's Third Round Rental Rehabilitation Demonstration Program would be conditioned on an amendment of the City's Housing Assistance Plan (hereinafter "HAP") to increase its current three-year family assisted housing goals by the

number of Section 8 Existing Certificates that would be provided under the Program. The letter then went on to say:

> Please be advised that a similar HAP amendment will be required in connection with Section 8 Existing Certificates to be made available by HUD under the City's regular Rental Rehabilitation Program for which an application is due by July 9, 1984 *and the MHA's application for 175 Section 8 Existing Certificates made available by the Department on May 3, 1984.*

Attachment 6 to Plaintiff-intervenors' Motion (emphasis added).

Neither the MHA nor counsel for plaintiff-intervenors was sent a copy of the Cruise Letter. In a letter sent the same day, George Beaton wrote to the Secretary-Director of the MHA, acknowledging receipt of the MHA's application for the 200 units of public housing and listing the additional materials to be supplied in connection therewith. No mention was made of the MHA's application for the Section 8 Certificates. *See* Attachment 7 to Plaintiff-intervenors' Motion. Nor apparently has there been any communication from HUD to the MHA or plaintiff-intervenors concerning the status of the MHA's application. In December of 1984, plaintiff-intervenors brought the present motion to

---

**3.** The Beaton Letter addressed both the public housing units and the Section 8 Certificates that were to be provided under the terms of the Consent Decree. The portion of the letter relating to the Section 8 Certificates is reproduced in full below.

> With respect to the Section 8 program, HUD will accept an application by your Authority to administer a Section 8 Existing Housing Program in the City of Yonkers for 175 2–BR family units. (Attachment 4)
>
> Your application must be submitted in accordance with the attached Consent Decree. Please ensure that all requirements as noted in said Decree are complied with in filing this application.
>
> Should there by any questions respecting the Section 8 Existing application, please contact Teresa Bainton at (212) 264–0808.
>
> Pursuant to paragraph 15 of the attached Consent Decree, you are advised that the De-

partment expects your Authority to make all diligent efforts to assist eligible families for Section 8 Existing housing to find such housing east of the Saw Mill River Parkway. Further we require your Authority to inform eligible applicants as to the nature of the 175 units, as well as to provide these applicants with the name of the HUD contact person to whom any applicants may complain concerning lack of cooperation by your Authority in assisting applicants in using these Certificates. The contact person for such problems is:

Mary Haight
Office of Fair Housing and Equal Opportunity
26 Federal Plaza, Room 3532
New York, New York 10278
(212) 264–8034

*Id.* A copy of the letter was sent to counsel for plaintiff-intervenors.

compel HUD to comply with the terms of the Consent Decree.[4]

Plaintiff-intervenors contend that HUD has "subverted the Consent Decree," Plaintiff-intervenors' Motion at p. 5, by conditioning provision of the Section 8 Existing Certificates upon the City's willingness to amend its current HAP. They contend that the Decree does not require or contemplate such a condition, and indeed that the Decree names the MHA as administrator of the Section 8 program precisely to avoid the need for any action on the part of the City. Plaintiff-intervenors also contend that HUD represented to them and to the Court "that it could and would waive any regulation which might have limited its ... capacity to fully and timely implement the Decree." Plaintiff-intervenors' Reply Mem. at p. 6.

HUD contends that it is, at present, prohibited by statute from approving the MHA's application for 175 Section 8 Existing Certificates unless the City amends its current HAP to increase the three-year goal for assisted family housing units. The statute in question is Section 213 of the Housing and Community Development Act of 1974, 42 U.S.C. § 1439, which, in essence, conditions approval of an application for federal housing assistance upon a finding that it is consistent with the area's HAP. HUD characterizes its failure to notify the MHA of this contingency as an "oversight," HUD Mem. in Opp. to Plaintiff-intervenors' Motion (hereinafter "HUD Mem. of Dec. 21, 1984") at p. 12, n. 8, and it contends that by notifying the City of the need for an amendment to the current HAP, it has taken the only action it presently can with respect to the implementation of the Decree's Section 8 Program.[5]

HUD notes that "[w]hile a specific deadline is set for HUD's invitation to the MHA to submit an application [for] Section 8 Existing funds, the Decree is silent as to when HUD must approve that application and actually award the Certificates." HUD Mem. of Dec. 21, 1984, at p. 4. In addition, HUD contends that plaintiff-intervenors were "well aware, prior to signing the Decree," id. at p. 2, that the number of units called for by the Decree exceeded the three-year goal in the City's HAP, and that the Decree itself reflects the "clear understanding" reached by the parties that all provisions of the Housing and Community Development Act of 1974, including the requirement of consistency with the area's current HAP, were fully applicable. Id. at p. 10. Thus, HUD contends that it "did not agree, and is therefore not obligated, to make all of the housing assistance specified in the Decree available in the same year where to do so would contravene the City's HAP," id., and that this Court is without the authority to order HUD to violate a federal statute or the regulations promulgated thereunder.

*The Obligations Imposed by the Terms of the Consent Decree*

HUD's contention that the Consent Decree parties intended to condition approval of the MHA's Section 8 application upon a finding of consistency with the City's HAP is clearly at variance with the terms of the Decree and the explicit representations made by the Consent Decree parties to this Court in urging approval of the Decree.

HUD places primary reliance on the fact that paragraph 11 of the Decree specifies a date by which HUD must invite

---

**4.** As noted earlier, Plaintiff-intervenors' motion concerned the 200 public housing units to be provided under the Decree as well as the 175 Section 8 Certificates. Oral argument concerning both was heard on December 27, 1984, and HUD was ordered to take certain steps with respect to the pending application for the 200 public housing units. At a subsequent status conference on April 9, 1985, the Consent Decree parties agreed that the Section 8 Certificates presented an entirely separate issue, and that it would be appropriate for the Court to rule on

that issue before final resolution of the dispute with respect to the public housing units.

**5.** The three-year HAP goals for families in the City's current HAP total 140 units. HUD has allocated all of those units toward the MHA's pending application for the 200 public housing units made available under the Decree. *See* HUD Mem. of Dec. 21, 1984, at p. 10, n. 5. Plaintiff-intervenors have not contested the propriety of this allocation, and this Opinion assumes that the allocation is in fact proper.

the MHA to apply for the Certificates, but not a date by which HUD must approve the application and award the certificates. However, the paragraphs that follow paragraph 11 contain no suggestion that there are any conditions precedent to HUD's approval of the application, or any suggestion that there may be reasons for delay in giving that approval. Instead, the paragraphs simply go on to describe the obligations of HUD in administering the certificates for a period of two years following their receipt by eligible families. The mere omission of an explicit deadline for performance does not give rise to an inference that the parties contemplated delay in, or conditions precedent to, performance. Where no deadline is specified, it is assumed that the parties intended performance within a reasonable time. *See, e.g., Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693 (S.D.N.Y.1976), *aff'd,* 552 F.2d 447 (2d Cir.1977).

Moreover, comparison of the paragraphs in the Decree concerning the Section 8 Existing Certificates with those concerning the 200 units of public housing negates any suggestion that the parties contemplated preconditions or possible delays in the approval of the MHA's Section 8 application. The Decree makes clear that participation by the City is required for construction of the public housing units, and it recites the measures which HUD can and will take to encourage that participation. *See* Consent Decree, paragraph (6). (The City's incentive to participate is a preexisting contract commitment to support, if funding should become available in the years governed by the City's 1982–85 HAP, the construction of 140 units of public housing for families outside areas of minority concentration.) In addition, the Decree clearly recognizes

that since the City has significantly less incentive to support 60 of the 200 units of public housing, HUD's ability to provide those units expeditiously (or indeed at all) is less certain. Paragraphs 7, 8 and 10 of the Decree reflect efforts to identify and, insofar as possible, provide for those contingencies. These detailed provisions stand in sharp contrast to the provisions governing the Section 8 Existing Certificates. It is, to say the least, unlikely that the Consent Decree parties believed that similar contingencies existed with respect to the Section 8 program but made no attempt to provide for them.[6]

The parties' own description of the Consent Decree to the Court in urging its approval similarly supports the conclusion that no party viewed HUD's obligation to approve the application as being conditioned upon the occurrence of any other event, nor anticipated any significant delay between the time of application and the time of approval. At the hearing held on March 1, 1984, in response to the Court's inquiry as to what would be achieved by approval of a settlement to which the City of Yonkers was not a party, and which ended only a portion of the litigation, counsel for plaintiff-intervenors replied, in relevant part, that:

> ... as the decree is currently written, there are certainly aspects of the decree which are not contingent upon the approval or participation for that matter of the City of Yonkers. The MHA is an independent agency under state law. Our discussions with Mr. Bushing, the chairman of the board of that agency and with Mr. Smith, its executive director, lead us to believe that it will actively participate, accepting the Section 8 participating certificates having been avail-

---

6. At oral argument on Plaintiff-intervenor's motion, HUD suggested that no provisions were made because none were possible. *See* Transcript at p. 20. As will become evident later in the Opinion, there is a great deal that could have been provided for. Indeed some of the provisions that could have been made (had they been thought necessary) are identical to those that were made with respect to the 200 units of public housing made available under the Con-

sent Decree. *See, e.g.,* Consent Decree, paragraph (7) & (8).

Moreover, it is simply absurd to suggest that the parties would make careful and detailed provision for the administration and monitoring of the Certificates, *see* Consent Decree paragraphs (12)–(15), but intentionally leave unaddressed issues affecting whether the Certificates would be awarded at all.

able through this decree and that will provide immediate relief as the units are made available to members of the class. Transcript at pp. 6–7.

HUD did not take issue with this description of the Decree's Section 8 program, nor did HUD's own references to the program (which focused primarily on the administration of the certificates by the MHA) in any way suggest that the program was dependent upon actions of the City. Similarly, the City's attorneys raised other objections to the Consent Decree but did not take issue with this representation. Thus, we fail to see how it was "obvious" either that all of the units provided for in the Decree could not be made immediately available without an amendment to the City's HAP, HUD Mem. of Dec. 21, 1984, at 6, or that "City was always in a position to block" implementation of the Section 8 program. Transcript of oral argument on Plaintiff-intervenors' Motion at p. 13. Plaintiff-intervenors' description of the Decree to the Court, and HUD's acquiescence in that description, indicate that the Consent Decree parties understood precisely the opposite to be true.

HUD's actions immediately following the Decree's approval similarly belie its claim that the Consent Decree parties understood that the Section 8 Certificates could not be provided as long as the City's current HAP remained in effect and unamended. HUD's invitation to the MHA to apply for the Section 8 Certificates carefully recited the conditions imposed upon the Certificates by the Consent Decree.[7] Yet, it made no mention of the need for an amendment of the City's HAP. Nor did HUD notify the City, at that time, of such a requirement. It was not until two months later, in the course of reviewing the City's application to participate in a different Section 8 program, that HUD first mentioned the need for an amendment to the City's HAP before any additional Section 8 Certificates—including those called for by the Consent Decree—could be awarded. Significantly, HUD's single mention of the

requirement was not phrased as a formal notification to the City, made pursuant to HUD's obligations under the Decree. Nor was it phrased as a reminder to plaintiff-intervenors or the MHA of a past understanding. Indeed, plaintiff-intervenors and the MHA were never notified of the requirement. The requirement was simply mentioned in passing to the City Manager in a letter on another subject, while a letter sent the same day to the MHA gave it further instruction about its application for the 200 public housing units, but was silent as to the simultaneously submitted Section 8 application. This course of conduct suggests that any connection between the City's HAP and the Consent Decree's Section 8 program was a belated discovery for HUD, and one that it was not eager to share with the MHA or plaintiff-intervenors.

HUD nonetheless contends that "the language of the Consent Decree itself evidences the clear understanding that all provisions of the HCDA, including Section 213 [the provision requiring consistency with the area's HAP], are fully applicable." HUD Mem. of Dec. 21, 1984, at p. 10. However, there is nothing in the language of the Consent Decree, or in the statements made by the Consent Decree parties or others prior to the Decree's approval, to suggest that the parties understood Section 213 to require an increase in the City's three-year HAP goals before HUD could award the Section 8 Certificates to the MHA.

In their memoranda in support of the Consent Decree, neither plaintiff-intervenors nor HUD mentioned Section 213 or the City's HAP in connection with the Section 8 Certificates. Similarly, although the City filed extensive objections to the Consent Decree, those objections did not include any to the effect that if HUD awarded the MHA 175 Section 8 Certificates, it would violate Section 213 by providing housing assistance in excess of the HAP's three-year goals. The only objection by the

7. *See, supra,* note 3.

City which was based on its HAP related to the "proportionality" requirement set forth in 24 C.F.R. § 570.306. The City contended that "[i]n effect, this regulation requires that housing assistance must be provided in accordance with the proportionate needs of the three different household types" as set forth in the area's HAP, City Mem. at p. 19, and that by providing housing only for families, with none for the elderly, the Consent Decree was inconsistent with the City's HAP and therefore should not be approved. *Id.* at pp. 18–20.

In reply, HUD contended that the City misunderstood the nature of the proportionality requirement contained in the regulations. HUD maintained that the requirement governed "only the planning of the City's goals to meet its housing needs [and did] not require HUD to disburse funding in the same proportion as the goals stated in a particular community's HAP." HUD Reply Mem. of March 1, 1984, at pp. 15–16. In addition, HUD suggested in passing that even if the City's interpretation of the regulation were accurate, HUD was in any case authorized to waive the regulation. *Id.* at p. 17, n. 8. Finally, HUD emphasized that the Decree did not require the City to exceed its three-year HAP goals. *Id.* at pp. 17–18.

This last point, if taken in isolation, lends support to HUD's current claim that the Consent Decree did not contemplate provision of the Section 8 Certificates as long as the City's current HAP remained in effect and unamended. When the whole of HUD's explanation is reviewed, however, the effect is just the opposite. HUD treated the issue of the City's three-year HAP goals as relevant only to the 200 public housing units to be provided under the Decree. HUD explained that the City "is obligated, under the terms of its CDBG grants, to a goal of 140 family units for the period 1982–85. This is exactly the number which the Consent Decree contemplates the City will support prior to the close of the program year ending on June 30, 1985. The remaining 60 units made available under the Decree are to be accommodated in the City's three-year HAP goal beginning in the following program years." HUD Reply Mem. of March 1, 1984, at pp. 17–18. No mention was made of the 175 Section 8 Certificates that were to be provided to the MHA. The reasonable conclusion to be drawn from this omission is that HUD did not consider the Section 8 Certificates to be housing units which required the City's support and thus which were subject to the limits set by the City in its three-year goals.

In the same vein, HUD's reply to the single objection by the City that was specific to the Decree's Section 8 Program reinforces the conclusion that HUD believed the City to have no involvement or necessary participation in the program. The City's objection was that the geographic limitations which the Decree imposed upon the use of the Certificates violated HUD regulations. HUD replied that since the City did not represent prospective applicants for the Certificates, and since "the certificates made available under the decree will be administered not by [a city agency] but by the [MHA], an independent agency," HUD Reply Mem. of March 1, 1984, at 14, the City "should not be heard to complain about this provision of the settlement." *Id.* Going on, nonetheless, to address the merits of the City's objection, HUD suggested that the Agency had considerable discretion in structuring Section 8 programs, and once again noted that the Secretary was, in any case, authorized, "for good cause, to waive any provision of the regulations dealing with the development of subsidized housing." *Id.* at 15.

■ In sum, both the language and the history of the Consent Decree belie HUD's present contention that the parties intended the approval of the MHA's Section 8 application to be conditioned upon a finding of consistency with the City's HAP. The Decree's Section 8 Program clearly was structured and presented to the Court as relief that could be provided expeditiously, and without the need for any action on the part of the City.

*HUD's Present Ability to Approve the MHA's Section 8 Application*

Whether HUD has the present ability to provide the relief it agreed to in the Consent Decree is another matter. As HUD correctly, though belatedly, points out, virtually all applications for federal housing assistance are subject to the requirements of Section 213. The exceptions are specifically enumerated, *see* 42 U.S.C. § 1439(b), and none is applicable here. Thus HUD cannot approve the MHA's Section 8 application if it finds the application to be inconsistent with the City's current HAP. 42 U.S.C. § 1439(a)(2), (3).[8]

The regulations promulgated under Section 213 provide that an application which (when taken together with other applications previously approved) would exceed the HAP's three-year household type goals by 20% or more cannot be approved unless an amendment to the HAP is submitted and approved. 24 C.F.R. §§ 791.205(c)(1); 791.206. Approval of the MHA's Section 8 application would exceed the City's current three-year HAP goals for families by more than 100%.[9]

■ At oral argument on this motion, HUD referred to Section 213 as being, in essence, an agreement between HUD and the City that the City will not be required to support any housing units in excess of the numbers designated in its three-year goals. Transcript at pp. 16–19. At least with respect to Section 8 Existing Certificates, however, it appears to have been an agreement of which neither the City nor

HUD was aware since neither raised the issue prior to the Consent Decree's approval. In addition, it is unclear that the City is being asked to "support" the Certificates in any substantial sense of the term. Unlike a publicly assisted housing project, Section 8 Existing Certificates do not entail tax abatements or increased municipal services. Nor do they involve any administrative cost to the local government when the Certificates are administered by an independent agency. Nonetheless, the terms of Section 213 make clear that Section 8 Existing Certificates are subject to its requirements, and thus cannot be awarded inconsistently with the area's HAP.

■ Plaintiff-intervenors contend that HUD represented to them and to the Court that it would waive any regulation that might otherwise have limited its ability to implement the Decree, and that HUD should be held to that representation with respect to the Decree's Section 8 program. At oral argument, HUD conceded its authority to waive regulations, but observed that the requirement in question is imposed by statute.[10] It can be replied, however, that the statute in question merely states the requirement of consistency without elaboration. *See* 42 U.S.C. § 1439. What *constitutes* consistency with a HAP is determined by regulation, not statute. *See* 24 C.F.R. §§ 791.204, 791.205. And since HUD is authorized to waive its regulations, subject to statutory limitations and upon a determination of good cause, 24 C.F.R. § 799.101, it can thus be argued that HUD

---

**8.** The statute provides that the "unit of general local government" is to be notified of HUD's receipt of a housing assistance application and given an opportunity to object to its approval on grounds of inconsistency with the area's current HAP. 42 U.S.C. § 1439(a)(1). If such an objection is received, the Secretary "may not approve the application unless he determines that the application is consistent with" the HAP. *Id.* at § 1439(a)(2). If no such objection is received, the Secretary "may approve the application unless he finds it inconsistent with" the HAP. *Id.* at § 1439(a)(3).

**9.** *See, supra,* note 5.

**10.** HUD's memorandum is considerably less forthright. It contends that HUD cannot be

required to violate a statute *or* its own regulations, and describes at length a case which held that HUD had no authority to waive a HAP's proportionality requirement. *HUD Mem.* of Dec. 21, 1984, at pp. 7–9 (citing *Lower Moreland Homeowner's Ass'n v. HUD,* 479 F.Supp. 886 (E.D.Pa.1979). No mention was made of HUD's prior invocation of its waiver authority in urging that the Decree be approved, nor of its prior dismissal of *Lower Moreland* as being no impediment to the implementation of the Decree on the ground (among others) that the case did not discuss the specific grant of waiver authority contained in the regulations. *See* HUD Reply Mem. of March 1, 1984 at pp. 14, 17.

may on occasion waive particular provisions of the regulations defining consistency with a HAP. HUD itself suggested as much in rejecting the City's objection that the Decree violated the requirement that housing assistance be proportional to housing needs. *See, supra,* p. 737.

A finding that HUD may waive the requirement of consistency with the three-year household type goals would be supported, at least on equitable grounds, by HUD's broad reliance on its waiver authority in urging approval of the Decree, by the City's failure to object to the Decree's Section 8 program on the ground of variation from the three-year HAP goals, and by the absence of any financial burden imposed upon the City by a waiver of the provision with respect to Section 8 Certificates.

However, HUD clearly cannot waive a particular provision of the regulations when doing so would be, in essence, a waiver of the statutory requirement of consistency with the HAP. A minor variation from a specific requirement would not present this problem, since it would be possible to state that despite the variation, the application is still, on the whole, consistent with the HAP. On the same theory, a general requirement such as one calling for "proportionality" of housing assistance to housing needs or goals could be interpreted flexibly. The regulations concerning three-year goals by household type, however, are highly specific, *see* 24 C.F.R. §§ 791.205(c)(1), 791.206, and the variation in question is considerable.

 As noted earlier, the regulations state that an application exceeding a HAP's three-year household type goal cannot be approved unless certain submissions are made by the local government, and that if the application exceeds the goal by 20% or more, a required submission is an amended HAP. *Id.* at § 791.206. The MHA's application would exceed the City's three-year goal for families by more than 100%. We do not believe that it is possible for HUD to waive such a variation and still state that, on the whole, the application is consistent with the area's HAP. Accordingly, we conclude that Section 213 of the HCDA does indeed appear to preclude HUD from approving the MHA's Section 8 application as long as the City's current HAP remains in effect and unamended.[11]

## HUD's Continuing Obligations Under the Decree

It should be clearly understood, however, that our holding on this point in no way excuses the inaction on the part of HUD which prompted plaintiff-intervenors' motion to enforce the decree. To the contrary, we find that in pursuing a course of virtually complete inaction, HUD has failed to act consistently with its obligations, either under the Consent Decree, or under the very statute it now invokes to justify its inaction.

 As we have already indicated, the contract embodied in the Consent Decree clearly contemplates expeditious approval of the MHA's Section 8 application. In addition, it is a fundamental principle of contract law that the parties to any contract undertake to act in good faith in performing their contractual obligations. *See, e.g., Zilg v. Prentice-Hall, Inc.,* 717 F.2d 671 (2d Cir.1983). Accordingly, when HUD discovered that there was an obstacle to expeditious approval of the MHA's application, it was incumbent upon HUD to notify plaintiff-intervenors of that obstacle, and to make every reasonable effort to

---

11. As noted earlier, this conclusion assumes the propriety of allocating the City's entire three-year goal for families to the public housing units made available by the Consent Decree but as yet unapproved. *See, supra,* note 3.

The conclusion also assumes, as the parties have, that the City in fact has an approved HAP currently in effect. There would appear to be occasion to question that assumption, however, since it is the Court's understanding that the City has yet to submit its annual HAP for the current year.

ensure that the Section 8 Certificates would be provided as expeditiously as possible.[12]

At a minimum, those efforts could have included the following. HUD could have formally notified the City of the MHA's application (as is, in any case, required under Section 213) and could have formally inquired of the City whether it wished to amend its current HAP to accommodate the Certificates. That inquiry could have been accompanied by a request that the City respond by a specific date, and could have indicated that HUD stood willing to approve the amendment and to waive any deficiency in the amended HAP relating to proportionality of the various housing goals to the community's housing needs.[13]

If the City had responded affirmatively, HUD could have then expeditiously approved the amended HAP and the MHA's Section 8 Existing application. If the City had declined to amend its HAP or had failed to respond by the stated date, HUD could have then notified plaintiff-intervenors of that fact, and in consultation with them, could have established a specific timetable of actions to be taken by HUD to increase the likelihood that the Decree's Section 8 Program would be implemented as expeditiously as possible. (Such a timetable is set forth below.) In addition, HUD could have notified the MHA of the status of its Section 8 application (as is, in any case, required by Section 213).

None of the actions enumerated above would have required any extraordinary effort on the part of HUD. Nor would they have involved any violation of HUD's duties under federal statute or regulation. Indeed, as noted above, several of the actions were in fact required by the very statute HUD now relies on to justify its inaction.

Yet, HUD took none of these actions. Instead, as noted earlier, HUD failed entirely to notify plaintiff-intervenors or the MHA of the problem with the Section 8 application. In addition, its only notice to the City was a passing reference to the issue in a letter concerning other matters. No effort was made to determine whether the City was in fact willing to amend its HAP, nor were any other steps being taken toward implementing the Decree's Section 8 program.

■ We have no difficulty concluding that as a matter of law, HUD has failed to make every reasonable effort to implement the Decree's Section 8 program as expeditiously as possible. In fact, HUD could have scarcely done less. Accordingly, Plaintiff-intervenor's motion for an order enforcing the Consent Decree is granted with respect to the Decree's Section 8 Program, and HUD is hereby ordered to make every reasonable effort to implement the Decree's Section 8 Program as expeditiously as possible. Moreover, given HUD's evident reluctance to acknowledge its obligations under this class-action settlement, we believe that specific guidance from the Court is in order as to what, at absolute minimum, is required of HUD at this time. Cf. Beecher v. Able, 575 F.2d 1010, 1016 (2d Cir.1978); Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974).

New York v. Local 333, 79 A.D.2d 410, 437 N.Y.S.2d 98 (1st Dept.1981), aff'd, 55 N.Y.2d 898, 449 N.Y.S.2d 29, 433 N.E.2d 1277 (1982).

---

12. As we have already indicated, the Consent Decree does not make the existence of a suitable HAP a condition precedent to HUD's duty to provide the Section 8 Certificates. Thus, HUD had no right to wait idly for that occurrence. Nor was it enough for HUD to make a token effort to overcome the obstacle presented by the City's current HAP. An unforeseen circumstance may excuse a delay in performance, but not if every reasonable effort has not been made to avoid or minimize that delay. See, e.g., Taylor-Edwards Warehouse v. Burlington Northern, Inc., 715 F.2d 1330, 1336 (9th Cir.1983); City of

13. As noted earlier, HUD suggested, in urging approval of the Consent Decree, that it had the authority to waive this requirement, see HUD Reply Mem. of March 1, 1984, at p. 17, n. 8, and it reaffirmed that position at oral argument on Plaintiff-intervenor's motion to enforce the Decree. See Transcript at pp. 18–19.

A timetable of specific actions to be taken by HUD is set forth below. The timetable reflects the Court's determination that it is presently incumbent upon HUD to make every reasonable effort: (1) to determine whether the City is in fact willing to amend its 1982–85 HAP to accommodate the Decree's Section 8 Program; and (2) to ensure that the Decree's Section 8 Program is in any event implemented no later than October 1, 1985.

With respect to the latter, it should be made clear that the Court sees no impediment to the implementation of the Decree's Section 8 Program after September 30, 1985. As of October 1, 1985, the City's 1982–85 HAP will expire, and any impediment which it represents to the approval of the MHA's Section 8 application will be removed. If a new HAP has not been submitted and approved, the MHA's application may be approved under Section 213(c) upon a determination by the Secretary that there is a need for the Section 8 Certificates. 42 U.S.C. § 1439(c). In this connection, HUD is reminded that in urging the approval of the Decree, it represented to the Court that it considered the housing assistance provided by the Decree to be appropriate and consistent with national policy. *See, generally,* HUD Reply Memo. of March 1, 1984. Such a representation necessarily includes a representation that there is a need for the Decree's Section 8 Program in Yonkers.

If a new HAP *is* submitted for approval, its three-year goals "must include all assisted housing resources which can be available to the grantee," 24 C.F.R. § 570.-306(e)(3) and HUD may disapprove that HAP if "the stated conditions and needs are plainly inconsistent with significant facts or data generally available [or the] proposed goals and activities are plainly inappropriate to meeting those conditions or needs, or ... fails to comply with other provisions of these regulations." 24 C.F.R. § 570.306(g). Here, too, the assistance made available by the Decree together with

HUD's representations in urging the Decree's approval, would appear to preclude any argument that HUD is without the authority to disapprove any HAP that does not establish three-year goals high enough to accommodate the Decree's Section 8 Program.

Accordingly, we find that HUD's obligations under the Consent Decree require, at minimum, that the following actions be taken:

1. HUD shall within five days from the date hereof notify the City, pursuant to 42 U.S.C. § 1439(a)(1), that the MHA has applied for the 175 Section 8 Existing Certificates made available by the Consent Decree. HUD's notification shall ask the City whether it wishes to amend the three-year goal for families in its 1982–85 HAP in order to accommodate the Certificates, and shall also advise the City that HUD stands ready to approve the amended HAP and to waive any variation from the proportionality requirement set forth in 24 C.F.R. § 570.306.[14] In addition, the notification shall request the City to respond expeditiously but in any event within the 30-day period provided for in 42 U.S.C. § 1439(a)(1)(B). A copy of the notification shall be sent to plaintiff-intervenors and to the Court.

2. If the City responds affirmatively, HUD shall within five days of the receipt of that response provide to plaintiff-intervenors, with a copy to the Court, a timetable of the necessary steps for approval.

3. If the City fails to respond, or responds negatively, HUD shall notify the City, with a copy to plaintiff-intervenors and the Court, that pursuant to 24 C.F.R. § 570.306(e)(3), the City's next three-year HAP goals "must include all assisted housing resources which can be expected to be available to the grantee," and that accordingly, HUD may disapprove any HAP that does not include a three-year goal for assistance to families high enough to accom-

---

**14.** *See, supra,* note 13.

modate the 175 Section 8 Existing Certificates made available by the Decree.

4. HUD shall not approve any HAP which would, for any reason, preclude approval of the MHA's Section 8 application without prior leave of the Court.

5. If the City declines to amend its 1982–85 HAP, then on September 1, 1985, HUD shall again notify the City, with a copy to plaintiff-intervenors and the Court, of the MHA's application and invite its comments pursuant to 42 U.S.C. § 1439. The notification shall advise the City that since the Section 8 Program is not scheduled to go into effect until after September 30, 1985, the City's comments are to be based upon its 1985–88 HAP (if one has been submitted and approved) or (if not) upon anticipated housing needs and conditions during that period.

6. If HUD believes it to be required by 24 C.F.R. § 791.203, it shall by August 1, 1985, issue a new invitation to the MHA to apply, within thirty days, for the 175 Section 8 Existing Certificates to be made available by the Decree. The invitation shall state that the funds will be available as of October 1, 1985, and thus, for purposes of 24 C.F.R. § 791.203, the invitation is based upon the HAP (if any) in effect at that time. A copy of the invitation shall be sent to plaintiff-intervenors and the Court.

7. On October 1, 1985 HUD shall approve the MHA's Section 8 application either under 42 U.S.C. § 1439(c) (if no approved HAP is in effect at that time) or under 42 U.S.C. § 1439(a) (if a suitable three-year HAP for 1985–88 has been submitted and approved).

If HUD is of the opinion that it cannot take any of the aforesaid steps despite this Court's Order, or is of the view that despite these steps *any* impediment will nevertheless exist to the actual issuance of the Section 8 Certificates pursuant to the aforesaid timetable, it shall so advise the Court and plaintiff-intervenors in writing within ten days from the date hereof.

SO ORDERED.

APPENDIX

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT NEW YORK

UNITED STATES OF AMERICA, et al., Plaintiff,

and

YONKERS BRANCH, NAACP, et al., Plaintiffs-Intervenors,

vs.

CITY OF YONKERS, et al., Defendants,

and

SAMUEL R. PIERCE, JR., SECRETARY, U.S. DEPARTMENT OF HUD, et al., Added Defendants.

80 CIV 6761 (LBS)

CONSENT DECREE

Plaintiffs-intervenors Charlotte Ryer, as class representative, and the NAACP, Yonkers Branch, and defendants Samuel R. Pierce, Jr., Secretary of the United States Department of Housing and Urban Development and the Department of Housing and Urban Development ("HUD"), through their undersigned counsel, have agreed to compromise and settle all claims and defenses alleged by these parties in the above-captioned litigation.

Now therefore, upon the consent of the parties, it is hereby ordered:

(1) This court has jurisdiction over HUD and over the subject matter of plaintiffs-intervenors' claims against HUD as set forth in its amended complaint in this Action.

(2) This consent decree applies to, and is binding upon the parties, including the members of plaintiffs-intervenors' class.

(3) Within 45 days of the date upon which this consent decree is entered by the Court, HUD will make available solely to the City of Yonkers, New York, and will invite the Yonkers Municipal Housing Authority ("MHA") to submit, within 60 days of the invitation, the initial application/proposal documents as required by HUD for two hundred (200) units of family (2 BR)

and large family public housing to be located east of the Saw Mill River Parkway within the City of Yonkers.

(4) The parties recognize that Section 6 of the United States Housing Act of 1937, was amended by Section 201(c) of the Housing and Urban-Rural Recovery Act of 1983, P.L. 98–181, to add new subsections 6(h), 6(i) and 6(j) which impose requirements concerning the development of public housing.

(5) For purposes of this settlement:

(a) consistent with the requirements of subsections 6(h) and 6(i), some or all of the 200 units of public housing may be new construction.

(b) for purposes of the cost comparability requirements of subsection 6(h) and 6(i), HUD shall only consider sites and properties within the City of Yonkers that are east of the Saw Mill River Parkway.

(c) If the MHA demonstrates to the satisfaction of HUD that no suitable buildings are available for acquisition, with or without rehabilitation, east of the Saw Mill River Parkway, then all two hundred units shall be used for new construction.

(d) HUD shall notify counsel for plaintiffs-intervenors as to the identity of any sites and properties submitted by the MHA in response to the aforementioned invitation and shall provide copies of correspondence between itself and the MHA on the issue of cost comparability.

(e) HUD shall make any additional interpretations of section 201(c) of the Housing and Urban-Rural Recovery Act of 1983 that are necessary to enable HUD, within the 45 day time period established in paragraph 3 of this decree, to invite the MHA to submit the initial application/proposal documents for the 200 units of public housing.

(f) Any housing developed pursuant to the invitation shall conform to applicable HUD regulations and this decree does not require HUD to waive any such regulations.

(g) HUD shall administer its responsibilities as set forth above so as to expedite the development of the units provided.

(6) Upon issuance of the invitation, HUD shall inform the City of Yonkers that, in conformance with its July 25, 1983 letter approving the City's 1983 Community Development Block Grant application:

(a) Within sixty (60) days of the issuance of the invitation the City must submit or cause to be submitted a request for a pre-approved site or sites, or follow such other procedure which HUD may require, for the development of at least 140 of the 200 units.

(b) Failure to submit or cause to be submitted such request(s), or failure to follow such other procedure as HUD may require, within sixty (60) days following publication of the invitation will cause HUD to initiate the procedure to reduce funding for the City's 1984 CDBG program, up to the full amount of the grant, pursuant to 24 CFR 570.911.

(c) The City is required to take all actions within its control to provide for the new construction (or acquisition or acquisition and rehabilitation) of the 140 units of public housing for families and large families in CDBG program year IX.

(7) In approving Yonkers' 1985 CDBG application, including the three year goals set forth in the City's HAP, HUD shall inform the City that it must insure that the HAP contains a sufficient goal for family units in light of available resources, including funding made available pursuant to this decree, to meet its low and moderate income housing needs, and that the City must take all actions within its control (consistent with CDBG regulations) to provide for the use of any of the aforementioned 200 public housing units still uncommitted to meet the established family housing goal.

(8) HUD may disapprove specific proposals for housing submitted by the City or the MHA which fail to meet applicable standards for approval. In rejecting such proposals, HUD shall provide the City and plaintiffs-intervenors in a timely fashion with specific reasons for its rejection of the proposal. HUD agrees that it shall reject

proposals only after consultation with the City and counsel for plaintiffs-intervenors and shall provide necessary technical assistance to the City and MHA in order to promote the presentation of acceptable and feasible sites.

(9) Based on previous representations by the City and the Community Development Agency of the City of Yonkers ("CDA") and the understanding of HUD, HUD shall encourage the City, if necessary to the successful utilization of the 200 units of public housing for families and large families, to use CDBG funds to reduce the acquisition and development costs of sites and properties and to take other appropriate administrative and/or legislative actions to facilitate and expedite the successful development of such housing. However, HUD may disallow any proposed use of CDBG monies in support of housing provision which contravenes its regulations.

(10) HUD will not recapture funds made available under the above invitation (except as specifically required by statute) for at least until the earlier of the expiration of eight years from the entry of this decree or the expiration of six years from the entry of, and the exhaustion of any appeal from, a judgement in favor of the plaintiffs-intervenors against the City in this action, unless HUD determines after its own survey that there are no developable sites or properties which could be acquired with or without rehabilitation, in Yonkers east of the Saw Mill River Parkway for which the funds may be used. Before HUD makes any such conclusion, it shall notify plaintiffs-intervenors that it has tentatively reached such a conclusion and of the bases for such a conclusion. HUD shall then convene a meeting with counsel for plaintiffs-intervenors to discuss its conclusion and the bases for that conclusion. Should plaintiffs-intervenors disagree with any such conclusion and object to HUD's recapture of any unused funds, it shall notify HUD in writing as to the bases of any such disagreement. Should the parties be unable to resolve their disagreement, either may submit, on motion, this matter for resolution to the court which shall retain jurisdiction to decide whether HUD's determination was arbitrary and capricious.

(11) Within 45 days of the date upon which this consent decree is entered by the court, HUD will invite the MHA to submit an application for one hundred and seventy-five (175) family certificates under the Section 8 Existing Housing Program.

(12) As a condition to the receipt of these certificates, HUD shall require that for the first one hundred and twenty days following the receipt by a family of a certificate, the MHA shall permit the family to use the certificate to obtain qualified housing only in buildings east of the Saw Mill River Parkway in the City of Yonkers. If after one hundred and twenty days from receipt of a certificate a family is unable to locate such housing, it may then use the certificate within the time period prescribed in 24 CFR 882.209(d) to assist in the payment of rent in qualified housing anywhere in the City of Yonkers.

(13) During the two years following its provision of the 175 Section 8 Existing certificates to the MHA, HUD shall conduct quarterly reviews of the use of these certificates and shall file with plaintiffs-intervenors and with the City these reviews. The reviews shall show the number of certificates in use; the location of the housing units assisted; the race of those using said certificates and the rent being paid with each certificate.

(14)(a) The fair market rents applicable to the 175 Section 8 Existing units shall be determined by HUD in conformity with all applicable HUD regulations.

(b) Under 24 C.F.R. § 882.106(a)(3), HUD may approve, upon request from a Public Housing Agency, maximum gross rents for all units of a given size of up to 20 percent above the applicable fair market rent within a designated municipality, county or similar locality. During the two years following its provision of the 175 Section 8 Existing certificates to the MHA, HUD shall approve any such request unless HUD determines that no special circumstances ex-

ist warranting an increase in maximum gross rents. In making such a determination, HUD shall consider the factors set forth in 24 C.F.R. § 882.106(a)(3).

(c) If HUD decides to deny such request for an increase in maximum gross rents or to approve an increase in an amount less than that requested, HUD shall provide the City and plaintiffs-intervenors in a timely fashion with the reasons for its action and shall take such action only after consultation with the City and counsel for plaintiffs-intervenors.

(15) HUD shall notify the MHA that it expects that agency to make all diligent efforts to assist eligible families to find housing in East Yonkers under the Section 8 Existing Program. Along with its quarterly report on the usage of said certificates, HUD shall inform plaintiff-intervenors of its findings concerning the efforts of the MHA to so utilize the Section 8 Existing certificates and any recommendations made by HUD to the MHA to improve the utilization rates of these units. HUD shall also require the MHA to inform eligible applicants as to the nature of these 175 units, as well as to provide these applicants with the name and phone number of a contact person at HUD to whom any such applicant may complain concerning the lack of cooperation by the MHA in assisting applicants in using these certificates. During the two years following its provision of the 175 units of Section 8 Existing certificates to the MHA, HUD shall on a quarterly basis, notify plaintiffs-intervenors of any such complaints and the steps it has initiated to resolve them.

(16) HUD reduction of City CDBG funding pursuant to 24 C.F.R. 570.911 because of City failure to utilize public housing units made available by HUD shall be cause, pursuant to 24 C.F.R. 570.453(a)(3), for withdrawal of the City's eligibility for Urban Development Action Grants ("UDAG") pursuant to HUD Handbook 6511.1 para 2–2d(2)(a), which subjects UDAG eligibility to the CDBG HAP performance standards in 24 C.F.R. 570.-909(e)(2).

(17) Except as specified herein, this consent decree shall have no effect upon HUD's authority to administer the housing and community development programs referred to herein.

(18) This consent decree fully records the obligations and rights of the parties hereto in compromise of the above-captioned action. Plaintiffs-intervenors shall not request of this court any further actions on the part of HUD in relation to the above-captioned action. This includes any further relief to require HUD to fund or financially assist additional remedial components. This does not preclude plaintiffs-intervenors from seeking additional relief against the City or the CDA, such as, for instance, requiring either or both of them to make applications to HUD for additional support. However, it is agreed that HUD shall apply its normal standards in evaluating such applications and is not hereby required to fund such applications.

(19) HUD's ability to perform any of its obligations specified in this consent decree is subject to the availability of funding from Congress for any purpose for which funding is required and to the existence of statutory authority generally authorizing acts necessary for performance by HUD. HUD shall not be held in violation of this decree on account of its failure to perform resulting from the unavailability of funding from Congress necessary for compliance, or from the modification or revocation of statutory authority necessary for compliance, or from the failure of HUD or any other person to seek such funding authority from Congress. Notwithstanding the foregoing, if at any time before the fulfillment of HUD's obligations under this decree, Congress fails to appropriate funds necessary for compliance, or revokes or substantially modifies any statutory authority of HUD necessary for compliance so as to prevent HUD from fulfilling its specified obligations, plaintiffs-intervenors shall be entitled to receive alternative relief comparable to that specified herein and consistent with HUD's revised funding or statutory authority for assisted housing.

In such event, HUD and plaintiffs-intervenors' counsel shall consult in an effort to agree upon a proposed modification of this decree to establish alternative HUD obligations. Any such change shall be reflected in a written amendment to this consent decree. If after a reasonable time, the parties are unable to agree on alternative HUD obligations, the entire matter shall, at the instance of either party, be submitted to this court for resolution and jurisdiction shall be retained for this purpose. In no event, however, shall such a revision in HUD's funding or statutory authority constitute grounds for reopening this decree for any purpose other than providing such alternative relief comparable to that specified herein.

(20) Within 60 days from the entry of this decree, counsel for plaintiffs-intervenors shall submit to HUD its claims for attorneys fees and costs arising from this action. Within forty-five days thereafter, HUD shall inform counsel for plaintiffs-intervenors as to the acceptability or unacceptability of such claim or make a counteroffer. Should the parties, after reasonable effort, be unable to resolve this matter, plaintiffs-intervenors shall submit its claim to the court for resolution.

(21) This consent decree is not evidence of or premised upon any admission or finding of liability on the part of HUD, nor does it reflect any agreed-upon purpose other than the desire of plaintiffs-intervenors and HUD to reach a full conclusion of this action as between the parties and to resolve this matter without the time and expense of further litigation.

(22) Plaintiff-intervenors' claims against HUD in its amended complaint are hereby dismissed with prejudice.