**ALTERNATIVE THINKING SYSTEMS, INC., Plaintiff,**

v.

**SIMON & SCHUSTER, INC., Defendant.**

No. 92 Civ. 4105 (MGC).

United States District Court,
S.D. New York.

June 7, 1994.

792

Michael J. Doyle, New York City, for plaintiff.

Kay Collyer & Boose by Marcia Paul, Michelena Hallie, New York City, for defendant.

## OPINION

CEDARBAUM, District Judge.

This diversity action arises from a dispute over a publishing contract between plaintiff, Alternative Thinking Systems ("ATS"), a Canadian corporation, and defendant, Simon & Schuster, a New York corporation. The complaint alleges that after Simon & Schuster had accepted as satisfactory for publication a book written by Ian Borts, the late President of ATS, it breached the contract by refusing to publish the book. ATS seeks specific performance of the agreement to publish and, in the alternative, money damages. Simon & Schuster counterclaims for reimbursement of the two advance payments it made to ATS. Simon & Schuster now moves for summary judgment on ATS' claims

and on its own counterclaims. ATS cross-moves for summary judgment on its claims, and moves to dismiss the counterclaims[1] and strike the affirmative defenses.

For the reasons discussed below, the motions of both sides for summary judgment on ATS' claims are denied, as is Simon & Schuster's motion for summary judgment on its counterclaims. ATS' motion for summary judgment dismissing Simon & Schuster's counterclaims is granted, as is its motion to strike the fourth and fifth affirmative defenses. ATS' motion to strike the first, second, third, sixth, and seventh affirmative defenses is denied as premature.

### The Facts

The following facts are undisputed. On June 24, 1987, ATS entered into a contract with Simon & Schuster, in the form of a "Publishing Agreement" and a "Basic Agreement," regarding a book to be written by Borts. Borts signed an Individual Guaranty, in which he "unconditionally guarantee[d] to [Simon & Schuster] the due performance by [ATS] ... of all the terms and conditions thereof on its part to be performed...." (Bender Aff. Ex. D.) Simon & Schuster agreed to pay ATS $162,500 in advances, which were to be made in four equal installments. The first payment was to be made upon the signing of the contract; the second payment, upon Simon & Schuster's acceptance of Borts' final manuscript as satisfactory for publication; the third payment, upon publication of the initial hardcover edition; and the fourth payment, six months after publication of the initial hardcover edition. (*Id.* Ex. B, ¶ Second C.) The first payment was made when the contract was signed on June 24, 1987.

Borts, a self-described "professional deep-trance medium," prepared a manuscript in which he described actual case histories of his experiences in transmitting medical advice he received from a "grouping of discarnate entities called the Speakers" to patients with various incurable diseases. (*Id.* Ex. A.) The final manuscript was delivered to Simon & Schuster more than six months after the scheduled December 31, 1987 due date. (*Id.* ¶¶ 13, 17; Ex. B ¶ First A.) In July 1988, Simon & Schuster accepted the manuscript, made the second advance payment according to the agreement, and scheduled publication for February 1989. (*Id.* ¶ 17; Ex. H.) Simon & Schuster then reviewed the manuscript for stylistic changes and typographical errors, and Borts submitted his responses to these changes in early September 1988. (*Id.* ¶ 19.) On September 10, 1988, at the age of 32, Borts died from a "post-operative complication" after an operation for "massive G.I. bleeding." (Hinrichs Aff. Ex. D.) Borts had been admitted to the hospital on August 26, 1988, six weeks after symptoms of cirrhosis of the liver had been detected. (*Id.*)

Following Borts' death, Simon & Schuster wrote to ATS' agent, William Morris, Inc., stating that:

> It's our opinion that we can't do an effective job of publicizing and promoting the book without [Borts]. We also think that the issue of credibility, which has always been the problem we'd have to overcome with the book, may now be a bigger problem than ever. Without [Borts] to say, "It actually happened to me," we'll have a tougher time convincing the media that the events described in the book are "true."

(Bender Aff. Ex. F.) Simon & Schuster's letter concludes that "[a]s a result, we've decided to take the book off our Winter 1989 list and to postpone it. At the present time I have no idea when we'll publish it." (*Id.*)

On October 7, 1988, ATS' agent responded by reminding Simon & Schuster of its obligation under the Publishing Agreement to publish the book within eighteen months of acceptance. (*Id.* Ex. G.) On November 9, 1988, Simon & Schuster stated that it could not confirm that the book would be published within the eighteen-month period and offered to proceed according to ¶ 84 of the Basic Agreement which would allow the rights to the book to revert to ATS and would allow ATS to keep the advance payments already

---

1. Both sides have treated this motion to dismiss as a motion for summary judgment, and have relied on material outside the complaint.

received if the book were not published within 180 days. (*Id.* Ex. H.) In reply, ATS' agent stated that ¶ 84 did not apply and demanded that all remaining advances be paid immediately in light of Simon & Schuster's willful refusal to publish. (*Id.* Ex. J.)

Three and one-half years later, in June 1992, ATS commenced this action for breach of contract. Simon & Schuster contends that it has performed all of its obligations under the contract. In addition, Simon & Schuster asserts a number of affirmative defenses, including ATS' failure to disclose Borts' illness, ATS' failure to make reasonable efforts to mitigate its damages, ATS' anticipatory breach of the contract, and frustration of the contract's purpose. Finally, Simon & Schuster asserts two counterclaims, each alleging a different theory for the return of the advance payments of $81,250.

## Discussion

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128, 1132 (2d Cir. 1989); *see Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### I. *ATS' Claims*

ATS argues that it is entitled to summary judgment based on the clear language of the contract which states that Simon & Schuster shall publish the book within eighteen months of acceptance. Simon & Schuster, on the other hand, argues that it has an absolute right to choose not to publish the book and that the language of the contract supports this position. Simon & Schuster adds that, in any event, it never decided not to publish the book and that it was ATS that "unilaterally denied [Simon & Schuster] the right to a delay ... and deemed [Simon & Schuster] in breach and demanded immediate payment." (Def. Reply Mem. at 9.) According to Simon & Schuster, ATS' only remedy when faced with the publisher's decision to delay publishing was to reclaim the rights to the book and retain the advances already paid. Simon & Schuster also argues that it was not obligated to publish the book because Borts' death interfered with its ability to complete a legal review of the book.

### A. *Does a Publisher Have an Absolute Right Not to Publish?*

■ Simon & Schuster argues that absent bad faith, a publisher has an absolute right to decide not to publish a book. For this proposition, Simon & Schuster relies on *Doubleday & Co., Inc. v. Curtis,* 763 F.2d 495 (2d Cir. 1985), and *Random House, Inc. v. Gold,* 464 F.Supp. 1306 (S.D.N.Y.), *aff'd,* 607 F.2d 998 (1979). Neither of these cases grants publishers an absolute right not to publish. The courts in *Curtis* and *Gold* each held that when a publishing contract conditions acceptance of a manuscript on its being "satisfactory to the publisher," the publisher has a duty to make this determination in good faith. *Curtis,* 763 F.2d at 500; *Gold,* 464 F.Supp. at 1308. Although the contract at issue here also contains a provision giving Simon & Schuster the right to decide whether Borts' manuscript will be accepted as "satisfactory," it is undisputed that Simon & Schuster accepted the manuscript as satisfactory in July 1988 when it made the second advance payment. (Bender Aff. Ex. H.)

Simon & Schuster relies on *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671 (2d Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984), for the proposition that a "publisher's ability to rely upon its own experience and judgment in marketing books" is protected and argues from that undisputed premise that a publisher has the right to choose not to publish a book. 717 F.2d at

680. However, the *Zilg* court did not even address the issue of a publisher's discretion in deciding whether to publish. Rather, the issue in *Zilg* was the scope of a publisher's discretion in promoting a book that it had already agreed to publish. *Id.*

Thus, although Simon & Schuster contends that publishers are accorded special rights so that they may "protect[ ] the editorial process," (Def. Mem. at 8), none of the cases it cites suggests that a publisher has an absolute right to decide at any time not to publish a book, regardless of the terms of its contract. The *Curtis, Gold,* and *Zilg* courts each looked to the terms of the parties' contracts in deciding the rights and obligations of the publisher. The dispute in this case arose after Simon & Schuster had accepted the manuscript for publication. Whether the publisher has a duty to publish the manuscript after having accepted it as satisfactory for publication depends on the terms of the contract between the parties.

## B. *The Publishing Contract*

■ The court's objective in construing the terms of a contract is to give effect to the intention of the parties. As the New York Court of Appeals has stated, "in searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their fair and reasonable meaning.... Put another way, the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 435 N.E.2d 1075, 1078, 450 N.Y.S.2d 460, 463 (1982) (citations omitted). In order to give full effect to the parties' expectations, the court must read the contract as a whole and "arrive at a construction which will give fair meaning to *all* of the language employed by the parties...." *Tantleff v. Truscelli,* 110 A.D.2d 240, 493 N.Y.S.2d 979, 983 (2d Dep't 1985) (emphasis in original), *aff'd,* 69 N.Y.2d 769, 505 N.E.2d 623, 513 N.Y.S.2d 113 (1987). Thus, a court must "avoid an interpretation that would leave contractual clauses meaningless." *Two Guys from Harrison, N.Y., Inc. v. S.F.R. Realty Associates,* 63 N.Y.2d 396, 472 N.E.2d

315, 482 N.Y.S.2d 465 (1984); *see American Express Bank, Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990).

■ Under New York law, if a contract is unambiguous on its face, its interpretation is a question of law and the rights of the parties under the contract may be determined on a motion for summary judgment. *American Express,* 562 N.Y.S.2d at 614. However, if a contract is ambiguous, the court must refer to extrinsic evidence to determine the intent of the parties. If the extrinsic evidence leads to conflicting interpretations of the contract, a genuine issue of material fact remains and summary judgment must be denied. *Id.; see Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990). Thus, the threshold question is whether the contract is unambiguous on its face. *See W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990); *Sutton,* 450 N.Y.S.2d at 462, 435 N.E.2d at 1077.

■ Both ATS and Simon & Schuster argue that the provisions of the contract are unambiguous. ATS relies primarily on ¶ Second A of the Publishing Agreement which states that Simon & Schuster "shall publish [the Literary Work] in book form on acceptance by it of the Literary Work within 18 months after such acceptance." (Bender Aff. Ex. B, ¶ Second A.) ATS contends that this provision establishes Simon & Schuster's duty to publish once it has accepted the manuscript as satisfactory for publication.

■ Simon & Schuster, on the other hand, argues that ¶ 50 of the Basic Agreement governs its duty to publish. Paragraph 50 provides that "[t]he Publisher shall have the exclusive right, but shall not be obligated, to dispose of or exercise any or all of the primary rights in and to the Literary Work." (Bender Aff. Ex. C ¶ 50.) One of the ten "primary rights" of the Publisher is "the exclusive right to publish trade editions of the Literary Work...." (*Id.* ¶¶ 1, 2.) A "trade edition" is defined as "the first edition of the Literary Work in book form...." (*Id.* ¶ 2.) Simon & Schuster argues from this

language that ¶ 50 establishes its authority to decide not to exercise its right to publish.

According to Simon & Schuster, ¶ Second A's provision for publication within eighteen months of acceptance merely sets an outside limit on how long it can hold onto the rights to the manuscript without publishing. Simon & Schuster argues that in the event that the eighteen-month period should expire, ¶ 84 of the Basic Agreement governs. Paragraph 84 provides that:

> The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Literary Work beyond the agreed publication date for a reasonable time in the event of late delivery by the Author of the manuscript in Final Form. Thereafter, if publication of the Literary Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Literary Work within 180 days after the date of such notice, then all of the Publisher's rights in and to the Literary Work shall terminate at the end of such 180–day period; and if, in such event, the Publisher shall fail to publish the Literary Work within such 180–day period, all of the Publisher's rights in and to the Literary Work shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments therefore made to Author under this Agreement.

(*Id.* ¶ 84.) Simon & Schuster contends that since the manuscript was delivered well after the December 31, 1987 contractual due date, ¶ 84 applies and that after Borts' death, the publication date was adjourned "indefinitely." According to Simon & Schuster, under those circumstances, ¶ 84 relegates ATS to the remedy of reclaiming the rights to the book and keeping the advance payments already made. (Def.Mem. at 14.)

ATS argues that ¶ 50 does not relieve Simon & Schuster of its duty to publish because its provisions do not address the fundamental duty to publish, but instead refer to Simon & Schuster's power to dispose of its intellectual property rights in the book. ATS argues further that ¶ 84 does not apply because Simon & Schuster did not delay publication but instead decided not to publish the manuscript. Since ATS never requested to proceed according to ¶ 84, but instead wrote to remind Simon & Schuster of its obligation to publish the book within eighteen months, ATS argues that Simon & Schuster cannot rely on ¶ 84 to avoid its obligation to publish.

Finally, Simon & Schuster argues that it was not obligated to publish the manuscript because Borts' death made a legal review of the manuscript impossible. It relies on ¶ 83(a), which provides as follows:

> Notwithstanding anything contained herein to the contrary, in no event shall the Publisher be obligated to publish the Literary Work if, in the reasonable judgment of its attorney, the Literary Work contains libelous or obscene material, or its publication would violate the right of privacy, common law or statutory copyrights, or any other rights of any person. In such event, unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment, Publisher shall be entitled within a reasonable period of time to the return of all monies advanced to the Author hereunder, and to terminate this agreement. . . .

(Bender Aff. Ex. C ¶ 83(a).) Simon & Schuster asserts that it could not determine whether the book contained any actionable material without Borts' help and that in view of Borts' premature death, it was not obligated to publish according to ¶ 83(a). It does not cite any specific legal problems with the work, but contends that the legal review was never completed because Borts' death made such a review futile. ATS responds by noting that ¶ 83(a) does not impose any obligation on the author unless Simon & Schuster's attorney determines that the book contains legally actionable material. ATS argues further that verification of Borts' claims would come not from Borts himself, but instead from the people whom Borts has healed.

The interpretations offered by ATS and Simon & Schuster of the terms of their agreement directly conflict. While ATS ar-

gues that ¶ Second A of the Publishing Agreement establishes Simon & Schuster's obligation to publish, Simon & Schuster argues that ¶ 50 of the Basic Agreement establishes its absolute right to decide not to publish. Simon & Schuster argues that ¶ Third C of the Publishing Agreement dictates that in case of conflict with a term in the Publishing Agreement, the terms of the Basic Agreement, and thus ¶ 50, would prevail. However, ¶ Third C simply states that the parties to the contract "agree to the following special provisions [regarding the computation of ATS' royalties], which shall prevail over any conflicting provisions in the Basic Agreement." (*Id.* Ex. B ¶ Third C.) This paragraph does not demonstrate the parties' intent to have all provisions of the Basic Agreement prevail over any conflicting provision in the Publishing Agreement, unless specified as a "special provision." A more reasonable interpretation of ¶ Third C is much more limited: any provision in the Basic Agreement that conflicts with the special provision concerning royalty payments should be disregarded.

The fact that the parties present the court with different interpretations of the contract does not mean that the contract is ambiguous, particularly where one party's "interpretation would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) (quoting *Bethlehem Steel Co. v. Turner Construction Co.,* 2 N.Y.2d 456, 141 N.E.2d 590, 592, 161 N.Y.S.2d 90, 93 (1957)). Paragraph Second A, which states that Simon & Schuster shall publish the book within eighteen months of acceptance, provides a clear statement regarding the expectations of the parties. Paragraph 50, on the other hand, which addresses Simon & Schuster's rights to dispose of and exercise its primary rights in the book, does not clearly relate to Simon & Schuster's obligation to publish and should not be read to undermine the expectations of the parties outlined in ¶ Second A.

Moreover, if the court were to accept Simon & Schuster's reading of ¶ 50, then ¶ 83(a) of the Basic Agreement would be superfluous. Paragraph 83(a) specifically limits Simon & Schuster's obligation to publish the book in the event that the book should contain any legally actionable material. Thus, it would be reasonable to interpret ¶ Second A as establishing the parties' intent that Simon & Schuster would publish the book within eighteen months of acceptance, and that this obligation is limited by the specific language of ¶ 83(a). If ¶ 50 gave Simon & Schuster the unqualified right to decide not to publish, the limitation specified in ¶ 83(a) would be meaningless.

The parties' conflicting interpretations of ¶ 84, however, cannot be resolved without looking beyond the terms of the contract. Simon & Schuster argues that ¶ 84 provides that ATS' sole remedy, in the event that Simon & Schuster should decide not to publish within the eighteen-month period provided in ¶ Second A, would be to keep the advance payments already received and to regain the rights to the book. According to Simon & Schuster, the eighteen-month period merely sets an outside limit on how long it is entitled to hold onto the rights to the book without publishing, and does not obligate it to actually publish the book. If the court were to accept Simon & Schuster's interpretation of ¶ 84, the duty to publish would be limited by Simon & Schuster's right to simply delay publication indefinitely. Although the language of ¶ 84 speaks only of a delay in publication and does not address Simon & Schuster's fundamental duty to publish, it is possible that the parties intended that ¶ 84 would be ATS' sole remedy in the event that Simon & Schuster should decide not to publish within the eighteen-month period.

If, on the other hand, the court were to accept ATS' interpretation of ¶ 84, Simon & Schuster would not be able to escape its obligation to publish under the guise of a "delay," and ¶ 84 would not apply unless there had in fact been a decision to delay publication, rather than to cancel publication altogether. In the present case, the manuscript was accepted in July 1988, and publication was scheduled for February 1989, seven months later. Under ATS' interpretation of the contract, ¶ 84 would apply only if Simon & Schuster inexcusably delayed publication beyond this February 1989 date, and the

eighteen-month period established by ¶ Second A had not yet expired. Then, if Simon & Schuster failed to publish within the eighteen-month period, ATS would not be limited by the remedy provided in ¶ 84, but would instead be entitled to sue for breach of contract. Because ¶ 84 is ambiguous, and thus makes the requirements of ¶ Second A uncertain, a question of fact remains regarding the parties' intention with respect to Simon & Schuster's duty to publish.

ATS argues that ¶ 83(b) of the Basic Agreement, which is included in the contract with a line drawn through its text, resolves any ambiguity created by ¶ 84 and supports its understanding that Simon & Schuster has a duty to publish. The deleted ¶ 83(b) provides as follows:

> The Publisher shall not be obligated to publish the Literary work if, whether before or after acceptance thereof, supervening events or circumstances since the date of this agreement have, in the sole judgment of the Publisher, materially adversely changed the economic expectations of the Publisher in respect to the Literary Work at the time of the making of this agreement, and in such event all of the Publisher's rights in and to the Literary Work shall terminate and revert to the Author on the giving by the Publisher to the Author of notice of its decision, or, if the Publisher fails to do so, by the Author pursuant to Paragraph 84, and in any such event, the Author shall be entitled to retain all payments to the Author theretofore made under this agreement.

(*Id.* ¶ 83(b).) ·ATS argues that because the evidence is clear that the parties excised this language from the contract, Simon & Schuster should not be permitted to argue that other provisions of the contract in effect restore the deleted language.

Although Simon & Schuster argues that the court may not consider extrinsic evidence of the parties' intent when the language of a contract is unambiguous, the contract is ambiguous, and extrinsic evidence must therefore be considered. *See Burger King*, 893 F.2d at 527–28. Had ¶ 83(b) been included in the contract, it would have created an additional limitation on Simon & Schuster's obli-

gation to publish, and would have given ATS only those rights outlined in ¶ 84 in the event that Simon & Schuster should fail to publish. While the exclusion of this provision suggests that the parties intended that Simon & Schuster's obligation to publish and ATS' right to a remedy would not be limited in this way, neither party has submitted an affidavit by an individual with personal knowledge of the contract negotiations that explains the parties' intention in removing this paragraph. Therefore, a genuine issue of material fact regarding the parties' intention remains.

Furthermore, if ¶ 84 is construed to apply only in the case of a publisher's decision to delay publication, and not in the case of a publisher's decision not to publish at all, an additional dispute of fact remains as to which of these decisions Simon & Schuster made in September 1988. The correspondence between Simon & Schuster and ATS' agent that followed Borts' death suggests that Simon & Schuster changed its decision regarding publication based on Borts' death and what Simon & Schuster perceived as Borts' resulting loss of credibility as a healer and his inability to assist in promoting the book. (*Id.* Ex. F.) The fact that these problems would not change with time seems to suggest that Simon & Schuster did not decide to delay publication, but rather decided not to publish. However, resolution of that issue will ultimately involve a question of credibility, and therefore cannot be resolved on a motion for summary judgment.

Finally, Simon & Schuster's argument that it was not obligated to publish pursuant to ¶ 83(a) lacks merit. Paragraph 83(a) does not require Borts' assistance in undertaking a legal review of the book. Paragraph 83(a) twice specifies that Simon & Schuster's attorney is responsible for deciding whether the book contains any legally actionable material. Only after such a determination is made is Borts required to make the changes requested. Although Simon & Schuster asserts that it cannot determine whether the book contains actionable material "without consultation with Borts," (Def.Mem. at 15), nowhere in ¶ 83(a) is such consultation required of Borts. Moreover, Simon & Schuster's reading of ¶ 83(a) contradicts the terms outlined

in ¶ 79 of the Basic Agreement. Paragraph 79 provides, in part, that following delivery of the manuscript in final form, Simon & Schuster "shall not have the right to terminate this agreement solely as a result of the death of the Author." (Bender Aff. Ex. C ¶ 79.) If Simon & Schuster did not have the right to terminate the agreement solely as a result of Borts' death, it would be unreasonable to read ¶ 83(a) as allowing Simon & Schuster to terminate the agreement because Borts' death made him unable to assist in the attorney's legal review. Therefore, ¶ 83(a) does not grant Simon & Schuster the right to terminate the agreement.

In sum, neither ¶ 50 nor ¶ 83(a) grants Simon & Schuster the absolute right to decide not to publish the book. However, because it is unclear how to reconcile the language of ¶ 84 with the requirements of ¶ Second A, the rights of the parties under the contract are unclear. Although the extrinsic evidence that ¶ 83(b) was deleted suggests that the parties did not intend to grant Simon & Schuster the absolute right to decide not to publish the book and leave ATS with only the remedy outlined in ¶ 84, this cannot be determined without more information regarding the negotiation of the contract. Therefore, the motions of both ATS and Simon & Schuster for summary judgment on ATS' claims are denied.

## II. *Simon & Schuster's Counterclaims*

▊ Simon & Schuster asserts two counterclaims, each alleging a different theory for the return of the $81,250 in advance payments made to ATS. First, Simon & Schuster argues that since Borts could not fulfill his obligation to assist in a legal review of the book, it had the right to terminate the contract and ATS had an obligation to return all payments advanced under the contract pursuant to ¶ 83(a) of the Basic Agreement. For the reasons discussed above, this argument is without merit.

Second, Simon & Schuster argues that ¶ 79 gives it the right to a refund of advance payments because any requests it might have for substantiation cannot be satisfied now that Borts is dead. Simon & Schuster cites only a small portion of ¶ 79 in its brief and in

doing so misinterprets its provisions. Paragraph 79 provides as follows:

> If, however, because of illness or any other factor beyond his control, the Author is unable so to deliver the Literary Work, the date for such delivery shall be extended for a reasonable time. If after the elapse of such reasonable time the Author continues to fail or is unable to deliver the Literary Work or to satisfy the Publisher's request(s) for changes or substantiation, the Publisher may give written notice of termination, effective at the expiration of 60 days or such longer period as the Publisher may specify in such notice, and if the Author shall fail to deliver the manuscript in Final Form within such 60 days or specified longer period, as the case may be, this agreement will be terminated at the expiration of said period, and the Publisher may recover all amounts advanced to the Author subject to the provisions of Paragraph 6 of the Rider....

(Bender Aff. Ex. C ¶ 79.) This paragraph, cited by Simon & Schuster to establish the Author's obligation to "satisfy the Publisher's request(s) for changes or substantiation," addresses Borts' obligations prior to submitting the manuscript to Simon & Schuster in "Final Form." As stated above, Borts delivered the book in final form in July 1988 and Simon & Schuster accepted it for publication. Therefore, these provisions do not apply. Moreover, as previously noted with respect to Borts' inability to assist with a legal review, if Simon & Schuster could not terminate the agreement following delivery of the book in final form solely as a result of Borts' death, it would be unreasonable to conclude that it could terminate the agreement based on Borts' inability by reason of his death to comply with any potential requests for changes or substantiation. In any event, Simon & Schuster has cited no requests for changes or substantiation that Borts failed to satisfy, nor has it provided any proof that it gave written notice of termination as required by this provision.

Simon & Schuster's reliance on Rider 6 of the Publishing Agreement, which is referred to in ¶ 79, is also misplaced. Simon & Schuster argues that Rider 6 requires ATS to

800

" 'make every effort to sell the work elsewhere, and [plaintiff] ... shall be obligated to repay advances hereunder ... from the first (and all) proceeds of any contracts with others concerning the rights in the work granted therein.' " (Def.Mem. at 21, quoting Bender Aff. Ex. B, Rider 6.) Once again, Simon & Schuster quotes only part of the provision, leaving out the first clause of Rider 6 which makes clear that its terms apply only "[i]n the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable...." (Bender Aff. Ex. B, Rider 6.) As stated earlier, Simon & Schuster deemed the manuscript "acceptable" in July 1988 when it made the second advance payment. Therefore, Rider 6 by its own terms does not apply.

Simon & Schuster's motion for summary judgment on its counterclaims is therefore denied and ATS' motion to dismiss the counterclaims is granted.

### III. *Simon & Schuster's Affirmative Defenses*

ATS moves to strike each of Simon & Schuster's seven affirmative defenses. Because discovery has not yet been completed, this motion must be denied as premature, except with respect to two of the affirmative defenses.

■ First, Simon & Schuster's affirmative defense of "frustration" must be stricken. Simon & Schuster argues that while certain clauses of the contract show that the possibility of the author's death was recognized by the parties when they drafted the contract, the cause of Borts' death, which undermined his credibility as a healer, could not have been contemplated. Simon & Schuster argues that the unforeseeable circumstances of Borts' death frustrated the purpose of the contract. ATS, in response, argues that Simon & Schuster could have foreseen this possibility and that the doctrine of frustration applies only when "the frustration [is] so severe that it is not fairly to be regarded as within the risks that [the party] assumed under the contract." *Strauss v. Long Island Sports, Inc.,* 60 A.D.2d 501, 401 N.Y.S.2d 233, 238 (2d Dep't 1978). Had Simon & Schuster

included contract language similar to that in the deleted ¶ 83(b), it would have been relieved of its duty to publish the book once it determined that Borts' death "materially adversely changed [its] economic expectations." (Bender Aff. Ex. C ¶ 83(b).) By agreeing to delete this language, Simon & Schuster chose to assume the risk that its economic expectations for the book might change, but that such change would not relieve it of its obligations under the contract. The affirmative defense of frustration is therefore stricken.

■ Second, Simon & Schuster's affirmative defense that ATS "anticipatorily breached the Agreement by reason of the death of Ian Borts" must also be stricken. As discussed earlier, Borts' death, which followed Simon & Schuster's acceptance of the final manuscript, did not constitute a breach of the contract.

### *Conclusion*

For the foregoing reasons, the motions of both ATS and Simon & Schuster for summary judgment on ATS' claims are denied, as is Simon & Schuster's motion for summary judgment on its counterclaims. ATS' motion for summary judgment dismissing the counterclaims is granted, as is its motion to strike the fourth and fifth affirmative defenses. Finally, ATS' motion to strike the first, second, third, sixth and seventh affirmative defenses is denied as premature.

SO ORDERED.