**ROYAL MORTGAGE CORP., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORP., Defendant.**

**No. 97 Civ. 637 (MGC).**

United States District Court, S.D. New York.

Sept. 29, 1998.

Orans, Elsen & Lupert LLP, by Gary H. Greenberg, Peter E. Seidman, New York City, for Plaintiff.

FDIC Legal Services Office, by Carol R. Edmead, Walter C. Vick, Jr., New York City, for Defendant.

## OPINION

CEDARBAUM, District Judge.

This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. Plaintiff seeks a judgment declaring that it, and not defendant, is the proper plaintiff in a pending action in the New York Supreme Court. The question presented is whether defendant assigned its rights in the state action to plaintiff.[1]

Both parties have moved for summary judgment. For the reasons discussed below, defendant did not assign its rights in the state action to plaintiff. Accordingly, plaintiff's motion is denied, and defendant's motion is granted.

### Background

#### Undisputed Facts

In 1987, Chase Bank issued loans to the Leader Alloys Company (hereafter "Leader loans"). The Leader loans were secured by an agreement that granted Chase a security interest in Leader's "personal property," including its inventory. The accounting firm of Ullman Weisberg/Pollack Einhorn certified the value of the inventory for the Leader loans.

In June 1988, the First New York Bank for Business (hereafter "FNYBB") purchased the Leader loans from Chase. Ullman, retained by Leader, continued regularly to certify the value of the Leader inventory from 1988 until 1990. FNYBB allegedly relied on the certifications for the years 1988 through 1990 to decide whether to increase

---

1. Royal Mortgage Corp. was substituted as plaintiff by a stipulation filed January 13, 1998. For the purposes of this Opinion, no distinction is made between Royal Mortgage Corp. and the original plaintiff.

the amount of the Leader loans and whether to renew the Leader loans.

In April 1991, Leader defaulted on the loans, and FNYBB liquidated Leader's inventory. When the value of the inventory turned out to be substantially less than Ullman had certified, FNYBB sued Ullman in the New York Supreme Court for breach of a third-party beneficiary contract and for negligent misrepresentation (hereafter the "Ullman action"). The Ullman action, which seeks $1 .2 million in damages, has been stayed pending the outcome of this action and this court's determination of the proper plaintiff in that action. (Def. 56.1 Stat. ¶ 3; Hawes Aff. ¶ 7; Hawes Aff., Ex. F, Ullman action Compl. ¶¶ 8, 11, 14, 17, 20, 33, 35, 39, 79; Hawes Aff., Ex. O, Compl., Ex. A, Leader loans security agreement; Pl.Mem. at 1 n. 3.)

On November 13, 1992, FNYBB was declared insolvent, and defendant was appointed receiver. Defendant then hired Crown North Corporation to manage an auction of the Leader loans. (Def. 56.1 Stat. ¶¶ 1–2.)

In 1995, defendant combined the Leader loans with five other loans as a non-performing loan pool, and held an auction of the loan pool. Plaintiff hired Robert Hawes to review the loan files for the purpose of valuing the loans, and determining if plaintiff should bid for them at the auction. (Hawes Aff. ¶¶ 1, 5–6.)

During the week of October 15, 1995, Hawes went to the Crown offices in Hoboken, New Jersey, to review the loan files. The Leader loan file contained documents pertaining to the Ullman action. Specifically, Hawes found the complaint, discovery documents, attorney notes on litigation strategy, litigation status reports dated from June through September of 1992, and notes from an FDIC lawyer dated from March through July of 1995. Hawes believed that the documents had been placed in the file because defendant intended to assign its rights in the Ullman action with the loans, and wanted bidders to be "aware of the full value of the loan" when formulating their bids. Hawes believed that the Leader loans themselves were uncollectible and worthless. (Hawes Aff. ¶¶ 6–7, 10–13.)

Hawes states that he spoke by telephone to one of Crown's loan advisors who was "to the best of my recollection" Jerry Lloyd. (Hawes Aff. ¶ 14.) Lloyd denies having spoken to Hawes. (Lloyd Aff. ¶ 3.)

At any rate, Hawes affirms that the loan advisor with whom he spoke told him that "it would seem that the FDIC is intending to assign the [Ullman action] to the buyer, otherwise they would have removed all of the law suit information from the file." (Hawes Aff. ¶ 14.)

Plaintiff ultimately bid $86,656.21 for the loan pool that included the Leader loans. The amount bid was 2.4 per cent of the value of the outstanding principal balance of the loans in the loan pool. (L.S.A. Attachment 1.) In his affidavit, Hawes states that but for the value of the Ullman action, plaintiff would have bid only $17,500 for the pool. (Hawes Aff. ¶¶ 16–17.) On December 28, 1995, defendant assigned to plaintiff the loans in the pool that included the Leader loans. (Ex. M.)

The documents presented by plaintiff do not show all the subsequent communications between the parties, but it does appear that in February 1996, plaintiff contacted defendant's counsel in the Ullman action seeking to be substituted as plaintiff in that action. After a number of letters were exchanged, defendant wrote to plaintiff on April 8, 1996, and stated that plaintiff had no interest in the Ullman action and had no right to be substituted as plaintiff. (Pl.Mem. at 5–6; Hawes Aff., Ex. T.)

*The Loan Sale Agreement*

The loan sale agreement (hereafter "L.S.A.") by which defendant sold the pool that included the Leader loans to plaintiff assigns to plaintiff "all the right, title, and interest of Seller . . . in and to each Loan in the Loan Pool(s)." L.S.A. ¶ 3.

"Loans" is defined as:

(a) the obligation evidenced by each promissory note included in the Loan Package; (b) any promissory note renewed by a Note, and any promissory note renewing any Note; (c) all rights, powers, liens, or security interests of the Seller in or under

any collateral document; and (d) any judgment founded upon a Note, to the extent attributable thereto, and any lien arising therefrom.

L.S.A. ¶ 1.13.

"Collateral Document" is defined as:

each deed of trust, mortgage, assignment of production, security agreement, assignment of security interest, personal guaranty, corporate guaranty, letter of credit, pledge, collateral agreement, loan agreement, or other agreement or document, whether an original or copy or whether similar to those enumerated, securing the performance or payment of any note evidencing a Loan subject to this Agreement, and inuring to the benefit of the holder of the Note.

L.S.A. ¶ 1.10.

The L.S.A. also contains a section entitled "Buyer's Duties Regarding Loans in Litigation," that states that "with respect to any Loan sold pursuant to [the L.S.A.] which is *the subject* of any type of pending litigation," the purchaser of a loan is obliged to substitute itself as the real party in interest in the litigation. L.S.A. ¶ 19 (emphasis added).

The L.S.A. provides that no agents of defendant are "authorized to make any statements or representations other than those specifically contained in this Agreement," and that the L.S.A. "supersedes any and all prior discussions and agreements between the Seller and Buyer with respect to the purchase of Loans and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein." L.S.A. ¶¶ 13.5, 33.

*Arguments of the Parties*

Both parties contend that the terms of the L.S.A. are unambiguous. (Pl. Reply Mem. at 3; transcript of oral argument, at 5, 25.)

Plaintiff argues that the complaint in the Ullman action is a "collateral document" within the meaning of L.S.A. ¶ 1.10, and that its right to pursue the Ullman action is a

"right[ ]" in or under a "collateral document" within the meaning of L.S.A. ¶ 1.13(c), and thus, that the Ullman action is a "loan" within the meaning of the contractual definition of that term. According to plaintiff, it acquired the Ullman action as a "Loan in the Loan Pool" under L.S.A. ¶ 3. (Pl.Mem. at 9, 10 n. 9, 22.)

Alternatively, plaintiff argues that the Leader loans security agreement is "the subject" of the Ullman action within the meaning of L.S.A. ¶ 19, and thus, that L.S.A. ¶ 19 gives plaintiff the duty and corresponding right to be substituted as the real party in interest in the Ullman action. (Pl.Mem. at 9–10, 22–23.)

Plaintiff's argument regarding L.S.A. ¶ 19 treats "loan" and "collateral document" as synonyms. (See, *e.g.*, Pl.Mem. at 9, arguing that "loan" is "defined to include Collateral Documents ... in particular the Leader Loans Security Agreement.") But a collateral document such as the security agreement[2] is not itself a "loan." Rather, "rights, powers, liens, or security interests of the Seller in or under any collateral document" are "loans," and such rights or interests can be "the subject" of litigation within the meaning of L.S.A. ¶ 19. Properly framed under the language of the L.S.A., plaintiff's argument is that the negligent certification of the value of Leader's inventory, the subject of the Ullman action, is a right, power, lien or security interest under the Leader loans security agreement.

Defendant responds that the complaint in the Ullman action is not a "collateral document" because it does not secure the payment of the loan. (Def. Reply Mem. at 5–6.) Defendant does not address plaintiff's alternative argument regarding the interpretation of L.S.A. ¶ 19.

*Discussion*

*Interpreting the L.S.A.*

■ Under New York law, when a party to a loan agreement assigns its contract rights in the agreement, ancillary rights of

---

**2.** There is no dispute that the Leader loans security agreement is a "collateral document" within

the meaning of L.S.A. ¶ 1.10.

action that arise out of the agreement are not automatically transferred, but may be assigned as part of the overall agreement. As a general matter, the question of whether the underlying actions have been assigned is one of contract interpretation that turns on whether the parties intended a transfer. *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 151–52 (2d Cir.1995); *see* N.Y. General Obligations Law § 13–101 (providing, with limited exceptions, for general assignability of claims); *M.W. Zack Metal Co. v. International Navigation Corp. of Monrovia*, 112 A.D.2d 865, 867–68, 493 N.Y.S.2d 145, 147 (1st Dep't 1985) (with limited exceptions, *choses* in action are freely assignable), *aff'd*, 67 N.Y.2d 892, 501 N.Y.S.2d 803, 492 N.E.2d 1219 (N.Y.1986).

■ The court's objective in construing the terms of a contract is to give effect to the intention of the parties. *Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.*, 853 F.Supp. 791, 795 (S.D.N.Y.1994). In the absence of ambiguity, the intent of the parties must be determined from the language of the written agreement, and extrinsic evidence is not admissible to aid in interpretation. *International Klafter Co. v. Continental Casualty Co.*, 869 F.2d 96, 100 (2d Cir. 1989); *Namad v. Salomon, Inc.*, 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80, 543 N.E.2d 722 (N.Y.1989).

■ A contract is unambiguous when the relevant language has a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996); *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (N.Y.1978). Whether a contract is ambiguous is to be determined by reference to the contract alone. *Banque Arabe*, 57 F.3d at 152; *Chimart Associates v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231 (N.Y.1986).

■ If a contract is unambiguous, its interpretation is a question of law, and the rights of the parties under the contract may be determined on a motion for summary judgment. *Nowak*, 81 F.3d at 1192; *Alternative Thinking*, 853 F.Supp. at 795.

■ The L.S.A. is unambiguous. Each of the provisions at issue—L.S.A. ¶¶ 1.10, 1.13, 3, and 19—are definite and precise, and allow no reasonable basis for a difference of opinion.

The Ullman complaint is not a "collateral document" within the meaning of the L.S.A. Collateral documents are defined in the L.S.A. itself as documents executed to "secur[e] the performance or payment of any note evidencing a Loan." L.S.A. ¶ 1.10. The Ullman complaint does not secure the performance or payment of the Leader loans.

Additionally, the "rights, powers, liens, or security interests in or under" the Leader loans security agreement are not "the subject" of the Ullman action within the meaning of L.S.A. ¶ 19. Contrary to plaintiff's argument, "the subject" of the Ullman action is Ullman's alleged malpractice. It is true that this subject is related to the "rights, powers, liens, or security interests in or under" the security agreement. The security agreement gave FNYBB an interest in the now-liquidated inventory. If Ullman overvalued the inventory, FNYBB was lulled into not adequately protecting its right to repayment of the Leader loans. However, this ancillary relationship between the Ullman action and the security agreement does not convert plaintiff's "rights, powers, liens, or security interests in or under" the Leader loans security agreement into "the subject" of the Ullman action.

In sum, the L.S.A. precisely defines what was assigned to plaintiff when it purchased the loan pool at auction. This precise definition does not include the Ullman action. In the absence of words of transfer, an intent to transfer cannot be implied from the unambiguous text of the L.S.A. *See Banque Arabe*, 57 F.3d at 151–52 (while no special language is required to transfer ancillary *choses* in action along with an assigned contract, the intent to transfer must be evident).

*Other Arguments*

Plaintiff raises two other arguments not directly related to the language of the L.S.A. First, plaintiff argues that the claims in the

Ullman action were necessarily transferred with the rights in the Leader loans because a single injury cannot give rise to a double recovery. Second, plaintiff argues that defendant is collaterally estopped from relying on its interpretation of the L.S.A. Both of these arguments are unpersuasive.

### 1. *Inseparable rights*

Plaintiff argues that the rights in the Leader loans could not be severed from the claims in the Ullman action because if defendant recovers on the claim against Ullman, plaintiff will be barred from recovering on the loans themselves. Thus, according to plaintiff, if the Ullman action was not assigned with the Leader loans, the Leader loans are potentially worthless. (Pl.Mem. at 10–11.)

Initially, plaintiff's argument is inconsistent with its assertion that prior to bidding on the loan pool that contained the Leader loans, plaintiff determined that the Leader loans were in fact valueless. (Hawes Aff. ¶ 17.) Thus, by plaintiff's own concession, a recovery in the Ullman action would not dilute the value of the Leader loans.

Second, if the Leader loans are collectible, a recovery in the Ullman action will not reduce the amount collectible on the Leader loans. To the contrary, damages recoverable in the Ullman action are measured by the difference between the amount collectible on the Leader loans and the pecuniary loss caused by the overvaluation of the collateral. Thus, any collectible portion of the Leader loans cannot be recovered as damages in the Ullman action.

In any event, plaintiff's argument merely begs the question of what the parties intended when they entered the L.S.A. Indeed, this was the conclusion reached in the very case plaintiff cites in support of its position. *See ACLI Int. Commodity Services, Inc. v. Banque Populaire Suisse,* 609 F.Supp. 434, 446 (S.D.N.Y.1984) ("[T]his alleged dilution of the assignee's rights must be evaluated in terms of what the parties to the assignment intended to accomplish."). The intent of the parties is found in the unambiguous language of the L.S.A.

### 2. *Equitable estoppel*

Plaintiff argues that defendant is equitably estopped from "relying on its interpretation" of the L.S.A. because defendant indicated during the bidding process that it intended to assign the Ullman action with the Leader loans. (Pl.Mem. at 14–19.) Plaintiff relies on two pieces of evidence to support this conclusion: (1) documents relating to the Ullman action were in the loan file that plaintiff was given to examine before bidding; and (2) a telephone conversation during which a Crown loan advisor allegedly told Hawes that "it would seem that" defendant intended to transfer the Ullman action. (Hawes Aff. ¶¶ 10, 14.)

The loan advisor's off-the-cuff statement that "it would seem that" the Ullman action would be transferred is too equivocal to constitute a representation on which an estoppel should rest. Equitable estoppel requires deliberate deception. *See General Electric Capital Corp. v. Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir.1994) (stating the elements of equitable estoppel under New York law).

The case on which plaintiff relies to support its equitable estoppel argument, *General Electric,* is inapposite. In *General Electric,* the defendant deliberately misled plaintiff as to its interpretation of a previously executed contract, and thereby induced plaintiff to surrender valuable rights under the contract. *General Electric,* 37 F.3d at 42–45.

Essentially, plaintiff's argument is that extrinsic evidence of defendant's intent should be admitted to show that plaintiff's interpretation of the L.S.A. is correct. Plaintiff's argument amounts to the incorrect assertion that extrinsic evidence is admissible to add to the terms of an unambiguous, integrated contract. *See Primex Int. Corp. v. Wal–Mart Stores, Inc.* 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 388, 679 N.E.2d 624 (1997) (general merger clause requires full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to add to the terms of the writing).

Courts in New York have rejected similar efforts to circumvent the parol evidence rule

by claiming estoppel. *See LeBovici v. Jamaica Sav. Bank*, 81 A.D.2d 150, 439 N.Y.S.2d 688 (2d Dep't 1981), *aff'd*, 56 N.Y.2d 522, 449 N.Y.S.2d 954, 434 N.E.2d 1332 (N.Y. 1982); *Continental Bank & Trust Co. of N.Y. v. W.A.R. Realty Corp.*, 265 A.D. 729, 40 N.Y.S.2d 854 (1st Dep't 1943). As in those cases, the equitable estoppel argument forwarded by plaintiff in this case goes to the heart of what the agreement between the parties was, and fails for that reason. *See LeBovici*, 81 A.D.2d at 151–52, 439 N.Y.S.2d at 689 ("The parol evidence rule cannot be ignored merely because a party claims an estoppel."); *Continental Bank*, 265 A.D. at 731–34, 40 N.Y.S.2d at 856–58 ("The parol evidence rule cannot be evaded or set aside by the device of claiming estoppel. To ground an estoppel a representation must concern existing facts and not a mere promise omitted from a written contract.")

Plaintiff cannot circumvent the parol evidence rule by invoking the term "equitable estoppel." Accordingly, I do not reach defendant's argument that equitable estoppel cannot be applied against the FDIC. (Def. Reply Mem. at 9–11.)

### Conclusion

For the reasons discussed above, the loan sale agreement does not assign the Ullman action with the Leader loans. Plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.

SO ORDERED.